IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

DANIEL W. JAMISON,               )
      Plaintiff,                  )          Civil Action No. 7:18-cv-00504
                              )
v.                               )
                              )          By: Elizabeth K. Dillon
HAROLD W. CLARKE, *et al.*,       )              United States District Judge
      Defendants.                 )

**MEMORANDUM OPINION**

Plaintiff Daniel W. Jamison, a Virginia inmate proceeding *pro se*, has brought this

lawsuit alleging claims pursuant to 42 U.S.C. § 1983 and a state law claim alleging violations of

the Virginia constitution.  Pending before the court is a motion for summary judgment filed by a

number of defendants represented by the Virginia Office of the Attorney General.  It includes

defendants who work at the Virginia Department of Corrections ("VDOC") and non-medical

personnel from both Nottoway Correctional Center ("Nottoway") and Dillwyn Correctional

Center ("Dillwyn"), where the relevant events occurred.  Specifically, the motion is brought on

behalf of fourteen defendants: H.W. Clarke, M. Amonette, N. Gregg, D. Ratliffe-Walker, Asst.

Warden Jones, J.D. Oates, T. Townes, M.E. Morgan,[1] C. Powell, D. Call, K. Schlobohm, D.

Lewis, Mr. Allen and L. Mason (collectively "VDOC defendants").[2]

In an order entered on February 10, 2020, the court noted that this summary judgment

motion was pending, and also noted that Jamison's response failed to identify with any

particularity upon what portions of his medical records he was relying in opposing summary

---

[1]  There is another defendant Morgan, whose first initial is C.  She is a nurse at Dillwyn and is referred to
throughout this opinion as "Nurse Morgan."

[2]  Another group of defendants ("the medical defendants") is represented by separate counsel.  Those
defendants' motion for summary judgment (Dkt. No. 120) will be addressed separately.  Unless otherwise noted,
references in this opinion to "defendants" are to all defendants.

judgment.  (02/10/2020 Order 2–3, Dkt. No. 101.)  Accordingly, the court directed supplemental briefing by the parties and has considered those supplemental briefs (Dkt. Nos. 104, 110, 111), in addition to the original briefing (Dkt. Nos. 84, 85, 92, 99).

In his initial opposition, Jamison stated that he wanted to voluntarily dismiss defendants Mason, Call, Lewis, and Allen.  (Dkt. No. 92 at 6–8, 17.)  Accordingly, those defendants will be dismissed without prejudice.

Defendants' summary judgment motion asserts six discrete arguments, but the court relies only on two to grant the motion.  First, the court concludes that Jamison failed to exhaust his administrative remedies as to any claims arising at Nottoway and as to any claims at Dillwyn that kitchen staff (or others) did not properly follow his doctor's prescribed diet order.  As to the Dillwyn-related claim he did exhaust—that defendants should have directed that he be placed on a gluten-free diet (or not removed from one)—these particular defendants cannot be liable for an Eighth Amendment violation where they relied on medical personnel to determine what diet was medically appropriate for Jamison.  For these reasons, discussed in more detail herein, the court will grant the summary judgment motion and dismiss all claims against the VDOC defendants, with the exception of any official-capacity claims against Amonette for declaratory or injunctive relief.

## I.   BACKGROUND

### A.  Legal Claims in Jamison's Complaint[3]

In general terms, Jamison claims that he has been diagnosed with celiac disease, which he describes as a "pre-[cancerous] digestive disorder" (Compl. 9, Dkt. No. 1) and that he also has an

---

[3]  The court permitted Jamison to file a supplemental complaint (Dkt. No. 102), but only insofar as it asserts an assault claim against defendant Dr. Ohai.  (See 02/10/2020 Mem. Op. 3–4, 8, Dkt. No. 100; Order ¶¶ 3–4.)  Because Dr. Ohai is not a VDOC defendant, the court does not consider the allegations in the supplemental complaint in this opinion.

allergy to chicken, in addition to a number of other medical issues.  The established treatment for celiac disease is a gluten-free diet.  Jamison alleges that, during his time at both Nottoway and Dillwyn, defendants failed to treat him for his celiac disease by either refusing to order that he be given a gluten-free diet or for interfering with his receiving such a diet once it was ordered.  He alleges that, as a result, he repeatedly was faced with the prospect of either going hungry or eating food that would make him very ill.  Specifically, when he eats foods containing gluten, he experiences significant physical symptoms and pain, including frequent blood in his stool, vomiting blood, severe and painful cramping, diarrhea, lethargy from the "lack of nutrients and vitamins," and headaches.  (Compl. 26.)  His complaint also challenges generally the medical care he received at Dillwyn.

Jamison's complaint contains three counts.  Count I is a § 1983 claim that alleges a violation of his Eighth Amendment rights based on the denial of medical care.  He asserts this count against all defendants and claims that their failure to provide adequate medical care constituted deliberate indifference to his serious medical needs.  (Compl. 39.)  Count II, also asserted against all defendants, is also a § 1983 claim alleging violations of the Eighth Amendment, as well as a claim alleging violations of article 1, Section 9 of the Virginia Constitution.[4]  (*Id.* at 40.)  Although this count again references "medical care," the court construes it as asserting a conditions-of-confinement claim—that the failure to provide him with an adequate diet violated the Eighth Amendment because it constituted cruel and unusual punishment.  Count III simply asks for equitable and declaratory relief.

---

[4]  Defendants' motion does not separately address the Virginia constitutional claim, but courts have held that article 1, Section 9 is not self-executing and thus does not provide a private cause of action.  *E.g.*, *Delk v. Moran*, No. 7:16CV00554, 2019 WL 1370880, at *4 (W.D. Va. Mar. 26, 2019); *Quigley v. McCabe*, No. 2:17cv70, 2017 WL 3821806, at *5 (E.D. Va. Aug. 30, 2017).  The court's research has found no cases holding to the contrary.  Thus, Jamison's claim based on this provision fails and must be dismissed.

3

**B.  Defendants' Summary Judgment Motion**

Excluding Lewis, Mason, Call, and Allen, who the court will dismiss at Jamison's request (Dkt. No. 92 at 17), the VDOC defendants are listed below, with the particulars of Jamison's allegations against each described briefly, although many of these allegations are denied by the listed defendants.[5]

1.  Clarke is the Director of VDOC.  The extent of Clarke's involvement as to Jamison's claims is that Jamison alleges that he sent a notarized letter to Clarke in July 2018, making him aware of his condition, but Clarke did not respond.  He also claims that Clarke should be held liable for allowing Dr. Ohai to continue to practice medicine at VDOC when he knew Dr. Ohai was ineffective.

2.  M. Amonette is a physician and the Chief Medical Director of VDOC.  As with Clarke, Jamison alleges that he sent Amonette a notarized letter, and Amonette did not respond to it.  After Jamison's transfer to Deerfield, Amonette personally directed that he be placed on a gluten-free diet in September 2019, "while offender is being worked up to confirm diagnosis." (Dkt. No. 104-1 at 23.)  The record also contains a March 12, 2020 diet order signed by Amonette requiring a gluten-free diet for Jamison.  (*See* Gregg Aff. #2 ¶ 5 & Encl. A, Dkt. No. 126-1.)

3.  N. Gregg is the statewide Dietician at VDOC.  Jamison sent Gregg a notarized letter asking for help, but she did not respond.  He further alleges that Powell and Morgan told him that when they inquired with Gregg about Jamison's needs, she told them "to just substitute and follow the wheat free diet.  Never mind the medical order."  She also allegedly told them, at some point, that Dr. Ohai did not submit the proper paperwork so "no proper diet would be given."

4.  D. Ratliffe-Walker is the Warden at Dillwyn.  She was aware of Jamison's condition both because of grievances and because her staff spoke to her about it.  Jamison also alleges that Ratliffe-Walker made false statements to the institutional lawyer concerning Jamison.

5.  Jones is the Assistant Warden at Dillwyn.  Jones removed Jamison from his prison kitchen job after Jamison vomited while on duty in the kitchen on multiple occasions, and after Townes, the Director of Food Services, filed an incident report.

---

[5]  Jamison also makes general allegations against all defendants, such as his allegation that they all knew of his condition and either failed to provide him with a proper diet or interfered with his receipt of a proper diet.

6. J.D. Oates is the former Chief of Housing and Programs at Dillwyn. Jamison alleges that Oates was aware of his condition but did nothing to help him.

7. T. Townes is the Food Operations Director at Dillwyn. Jamison alleges that Townes was aware of his condition and had observed Jamison's aversions to certain foods. Nonetheless, Townes continued to feed Jamison food that he could not eat. Jamison also complains that Townes retaliated against him by filing an incident report after Jamison became ill in the kitchen, which resulted in Jamison losing his kitchen job. Townes also responded to one of Jamison's requests by saying that she knew he couldn't eat beans and other things and advising him that, if there were items he could not eat on his tray, he should "just eat around them."

8. M.E. Morgan is the Assistant Food Operations Director at Dillwyn. Jamison alleges that she had seen his medical records and knew of his food restrictions. Together with Powell, Morgan contacted Gregg about what to feed Jamison, who told them to just substitute and follow the wheat-free diet.

9. C. Powell is the Food Services Supervisor at Dillwyn. In addition to the same allegations lodged against Morgan, Jamison alleges that Powell also: posted Jamison's confidential medical information on the wall; discussed his condition with other offenders and mocked his condition; and retaliated against Jamison on numerous occasions. She also threatened other offenders' jobs if they tried to give Jamison food to eat.

10. K. Schlobohm is the Assistant Warden at Nottoway. Jamison's complaint does not contain any allegations specifically about Schlobohm.

In support of their motion, the VDOC defendants have provided affidavits from eight individuals (defendants and others), which also include significant portions of Jamison's medical records and grievance documents.[6] Jamison's complaint is a verified complaint, and so the court treats the factual averments in it, if based on personal knowledge, as evidence in opposition to the summary judgment motion. *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991). Additionally, Jamison's first opposition (Dkt. No. 92), his subsequent brief ordered by the court (Dkt. No. 104), and his sur-reply (Dkt. No. 111)—which he did not seek leave to file, but which the court has considered—also are signed and sworn to under penalty of perjury. (Dkt. No. 92 at

---

[6] The affidavits and corresponding docket numbers are from Gregg (Dkt. No. 85-1), Ratliffe-Walker (85-2), Jones (85-3), Kinley (85-4), Townes (85-5), Morgan (85-6), Powell, (85-7), and Lewis (85-8).

33; Dkt. No. 104 at 20; Dkt. No. 111 at 10.)  Thus, to the extent that those documents set forth

facts within his personal knowledge, the court also treats those facts as Jamison's summary

judgment evidence.

## C.  Factual Background

As noted above, the events alleged in Jamison's complaint took place at two different

institutions.  From March 20, 2018, to May 16, 2018, Jamison was housed at Nottoway, and he

was thereafter transferred to Dillwyn, where he was housed from May 16, 2018, until August

2019.  He alleges that, while at Nottoway, he was repeatedly advised that the facility did not

offer a gluten-free diet and he was not given one.  Defendants' records indicate that he was given

a gluten-free diet immediately upon his transfer to Dillwyn, but Jamison alleges—and Dr. Ohai's

affidavit confirms—that Dr. Ohai revoked that diet order in July 2018, after Jamison purchased

items containing gluten from the commissary.  Jamison also alleges that, even when he had a

medical diet order for a gluten-free diet, defendants working in the Dillwyn kitchen, either on

Gregg's orders or of their own accord, failed to provide it.  Instead, his food trays often

contained items with gluten.  Jamison was transferred to Deerfield in August 2019, where he is

currently housed.  Although it appears that a gluten-free order is in place for him at Deerfield, he

complains in his latest filing that he still "is not receiving a gluten-free diet of recognized

standard per policy" and blames this on Gregg, as well as Deerfield's kitchen staff, who are not

defendants.

The court does not discuss the specifics of Jamison's diet or his medical treatment in this

opinion, but those issues will be discussed in more detail in the opinion addressing the medical

defendants' motion for summary judgment.  The court notes, though, that an accurate

understanding of the facts underlying Jamison's diet orders has been elusive.  This is primarily

because the various affidavits and documents in this case (especially as between the VDOC

defendants and the medical defendants) are not consistent on some major points, and Jamison disputes portions of the affidavits, as well.[7]  For purposes of summary judgment, the court has construed any disputed facts in the light most favorable to Jamison, as it must.  Ultimately, though, these facts (even construed in his favor) do not defeat summary judgment, because they do not affect the grounds on which the court grants it.  The first such ground is his failure to exhaust, and the court turns to the relevant facts on that ground next.

### 1. Exhaustion Generally

VDOC Operating Procedure ("OP") 866.1, Offender Grievance Procedure, is the mechanism used to resolve inmate complaints, and it applies to most aspects of prison life.  OP 866.1 requires that, before submitting a formal grievance (also known as a "regular grievance"), the inmate must demonstrate that he has made a good faith effort to resolve the issue informally through the procedures available at the institution to secure institutional services or resolve complaints.  Generally, this may be accomplished by submitting an informal complaint to the grievance department, which is then forwarded to the appropriate staff for investigation and response.  The response should be given within 15 calendar days.

---

[7]  Three examples of the inconsistencies will demonstrate the problem.  First, Dr. Ohai avers that on July 3, 2018, he told Jamison that VDOC "does not provide gluten free diets for other inmates with proven [c]eliac disease, [c]eliac disease variants and possible IBD."  (Ohai Decl. ¶ 11, Dkt. No. 121-1.)  However, several of the VDOC defendants aver that, upon Jamison's arrival in May 2018, the medical department submitted a diet order stating that Jamison was to receive an allergy diet with no "chicken or gluten."  (Morgan Aff. ¶ 5; Encl. B; Townes Aff. ¶ 4.)

Second, Dr. Ohai avers that on July 4, 2018, after being advised that Jamison was ordering foods containing gluten, Dr. Ohai discontinued Jamison's special diet order.  (Ohai Decl. ¶ 12.)  That notation appears in Jamison's medical records and also was referenced in Nurse Morgan's response to Jamison's informal complaint on the issue.  By contrast, none of the affidavits from the kitchen staff at Dillwyn say anything about Jamison's diet order ever being withdrawn or suspended, either during that time or any time while he was at Dillwyn.  Instead, they state that his diet order was "renewed" in September 2018.

Third, the renewal order is dated September 14, 2018.  (Morgan Aff., Encl. C).  Dr. Ohai's affidavit, however, states that he continued to deny Jamison's requests for a diet order or "food pass," in appointments on August 14 and September 18, 2018.  (Ohai Decl. ¶¶ 14, 15), both before and after the "renewed" diet order.

The issues of Jamison's diet orders are further complicated because the witnesses are either inconsistent or imprecise in their use of "wheat" versus "gluten."  Indeed, some affiants appear to use them interchangeably, although a gluten-free diet is more restrictive than a wheat-free diet, in that it also requires avoiding rye and barley, and products made from wheat, rye or barley.  (Dkt. No. 104-1 at 53–56.)  As a result, it is unclear whether the change in the September 14, 2018 order from no gluten to no wheat was intentional and whether VDOC's "wheat-free" diet is also entirely (or only mostly) gluten-free.

If the informal resolution effort fails, the inmate must initiate a regular grievance by filling out the appropriate form.  Prior to reviewing the substantive claims of the grievance, prison officials conduct an "intake" review of the grievance to ensure that it meets the published criteria for acceptance.  Among other criteria, the regular grievance must include the informal complaint as documentation of the prisoner's attempt to resolve the issue informally.  (Kinley Aff. ¶ 7; Lewis Aff. ¶ 7.)  If the grievance does not meet the criteria for acceptance, prison officials complete the "intake" section of the grievance and return it to the inmate with instructions on how to remedy any problems with it.  That should be done within two days of receipt.  The inmate may seek review of the intake decision by sending the grievance form to the Regional Ombudsman.  (Kinley Aff. ¶ 6; Lewis Aff. ¶ 6.)

There are three levels of review for an accepted regular grievance.  The Facility Unit Head of the facility in which the inmate is confined is responsible for Level I review, and a response must be issued within thirty days.  A dissatisfied inmate may appeal to Level II, which is conducted by the Regional Administrator, the Health Services Director, Superintendent of Education, or the Chief of Operations for Classification and Records.  Level II responses must be made within twenty days.  For most issues, Level II is the final level of review.  The Level II response informs the offender whether he may pursue an appeal to Level III, which is the final level of review.  For those issues appealable to Level III, the Chief of Corrections Operations or Director of VDOC conducts a review of the informal grievance, and the response must be made within twenty days.  (Kinley Aff. ¶ 8; Lewis Aff. ¶ 8.)

## 2. Jamison's Attempts at Exhaustion

### a. Nottoway

The first relevant grievance filed by Jamison at Nottoway was filed on May 8, 2018, in which he stated that he was not being given a proper diet at Nottoway.  The same day, Lewis

rejected the grievance on intake because Jamison had failed to use the informal process to resolve the complaint.  (Lewis Aff. ¶ 9.)  Lewis returned the paperwork to Jamison and asked him to resubmit within the parameters of OP 866.1  (*Id.* & Encl. B.)

On May 14, two days before he was transferred to Dillwyn, Jamison submitted another grievance.  Jamison attached to the grievance seven *unprocessed* informal complaints regarding the alleged denial of a proper diet.  None of these were processed because they were considered duplicative of Informal Complaint NCC-18-INF-911, submitted on May 2, which was processed. (*Id.* ¶ 10.)

In his summary judgment opposition, Jamison points to the May 2 informal complaint as showing his attempt to exhaust.  In that informal complaint, he stated:

> I am not receiving a proper diet.  I have celiac disease as noted in my medical file.  I have had significant medical issues as noted in my medical file from constant vomiting, diarrhea to weight loss.  I am also having a lot of stomach and intestinal issues.  Please see me as soon as possible.  This does go against my constitutional rights as prison officials have to by law give me a diet for medical reasons.  Thank you.

(Dkt. No. 92-1 at 3 (grammatical and spelling errors corrected).)  The informal complaint was routed to the medical department, and defendant P. McCabe responded on May 9 by saying that "Nottoway does not have a gluten-free diet.  Please check with dietary when you transfer to your permanent facility."  (*Id.*)

However, because Jamison failed to attach that processed informal complaint to his May 14 grievance, Lewis told him to refile his grievance attaching a copy of that processed informal complaint as required by policy.  (Lewis Aff. ¶ 10, Encl. C.)  Jamison never resubmitted the regular grievance with the proper informal complaint, nor did he ever appeal from the intake decision.  (*Id.* ¶ 11.)  Indeed, Jamison does not provide any evidence that he timely filed a regular grievance after receiving that response.  Thus, as to claims arising from the denial of a

medically appropriate diet at Nottoway, he failed to properly exhaust his available remedies in accordance with OP 866.1.  (*Id.*)

### b.  Dillwyn

Jamison was transferred to Dillwyn on May 16, 2018.  (Kinley Aff. ¶ 4; Compl. 12.) According to defendants, upon Jamison's arrival, medical staff issued a diet order for him to receive an allergy diet with no chicken or gluten.  (Morgan Aff. ¶ 5, Encl. B; Townes Aff. ¶ 4.) On July 3, Jamison saw Dr. Ohai after complaining of vomiting and rectal bleeding.  Dr. Ohai noted that in the preceding days, while under observation in the medical unit, Jamison had been seen with an open bag of pretzels.  Additionally, Jamison's commissary records reflected that he was purchasing food from the commissary that contained gluten, although Jamison claimed he was not consuming those items but was trading them for food he could eat.  (Ohai Decl. ¶ 11 & Med. R., Dkt. No. 121-2.)   On July 4, 2018, based on reports that Jamison continued to order gluten foods from the commissary, Dr. Ohai discontinued the order for a special diet.  (*Id.* ¶ 12.)

On July 6, 2018, Jamison filed an informal complaint that he relies upon to show exhaustion.  (*See* Dkt. No. 92-1 at 4.)  In it, he complained that he was being refused food for a medical condition and that, when he filed an emergency grievance, he was instead told to submit a sick call request.  He asserted that because there is no sick call on the weekend, he would "starve" all weekend.  He further claimed that "[t]his is nothing more than more retaliation by medical staff" and stated that he should be notified as to what he should do in terms of his diet. He also stated that there are some great nurses in medical, but asked whether there are any "competent supervisors in medical or do they do what they want?"  In response, Nurse Morgan responded that his commissary list verifies that he was purchasing gluten foods.  She continued, "A diet order is not indicated as you are ordering gluten foods."  (*Id.* at 4.)

After this informal grievance was denied, Jamison filed a regular grievance on July 17, 2018, attaching the informal complaint.  In it, he complained that he was being improperly charged with a disciplinary charge of unauthorized transfer or sale of personal property.  The charge was based on his telling Nurse Morgan that he had not eaten the commissary items he had purchased, but he had traded them for food that he could eat.  He claimed that the disciplinary charge was retaliation by Nurse Morgan.  His grievance also stated that his diet never should have been taken away and again reiterated his belief that VDOC had a constitutional obligation to provide special diets for medical reasons.  (*Id.* at 5.)

Upon Level I review, Warden Ratliffe-Walker determined that Jamison's grievance was unfounded.  (*Id.* at 6.)  She indicated that she had investigated Jamison's complaint, and her response cited to OP 501, which states that "[o]nly medical practitioners, QMHPs and dentists may order therapeutic diets" and must document the justification in the health record.  The response also stated that "further investigation revealed," per Nurse Morgan, that a gluten-free diet would not be ordered for Jamison because he continued to purchase commissary foods containing gluten.  (*Id.*)

Jamison then submitted a Level II appeal.  (*Id.* at 7.)  The person responding to the Level II appeal stated, "I concur with the Level I response and have determined your grievance" is unfounded.  (*Id.*)  The response also advised him that Level II was the last level of appeal for this complaint and thus that he had exhausted his administrative remedies.  (*Id.*)  Based on these documents, Jamison fully exhausted the issues raised in this grievance, which included claims that he needed a gluten-free diet and that his diet never should have been taken away.   Notably, however, nothing in these documents referenced kitchen staff not providing proper foods as ordered.  To be sure, Jamison filed a number of informal complaints and grievances while at Dillwyn about his food trays having the incorrect items and items with gluten.  Most of these

were filed *after* he filed his complaint, but even as to most of these, he failed to ever pursue his grievances through to the last level of appeal. For example, Jamison filed two regular grievances on January 17, 2019 (after filing this case), one complaining that food service was not providing the proper food for his medical condition of celiac disease, and the other complaining that the medical staff had written an order for a diet that was not correct for his medical condition. He appealed Both of those were deemed unfounded by Ratliffe-Walker at Level I, but Jamison never appealed either of those Level I decisions to Level II. (Kinley Aff. ¶ 10–11, Encl. C & D; Morgan Aff. ¶ 4.)

### c. Alleged interference with grievance procedure

Jamison repeatedly insists—in conclusory fashion—that he exhausted his administrative remedies. He also alleges that he was precluded from exhausting at both institutions. In essence, he argues that the administrative remedy was unavailable to him. Specifically, Jamison alleges in general terms that both Mason, the prior Dillwyn ombudsman, and Lewis, the Nottoway ombudsman, hindered Jamison's ability to file grievances. As to Lewis, he specifically alleges that Lewis told him his grievances would never be filed at Nottoway, which Lewis denies. (*Compare* Compl. 19-20, 25 *with* Lewis Aff. ¶ 12.) But even if Lewis told Jamison that, Lewis properly followed procedure in processing Jamison's grievances. Indeed, Jamison has not presented evidence showing that any grievance or other document was improperly denied. Lewis also instructed Jamison repeatedly as to how to properly submit his grievance paperwork. Jamison could have resubmitted his grievance with the proper paperwork or appealed the intake decision, but he failed to do either.

Similarly, Jamison alleges that the Dillwyn's former grievance coordinator, Mason, did not process his grievances. Institutional records reflect, however, that Dillwyn processed approximately 86 informal complaints and grievances for Jamison between his arrival in May

12

2018 and September 2019.  (Kinley Aff. ¶ 12.)  Moreover, Jamison does not offer any explanation as to why, even as to those grievances he filed after filing suit, he failed to appeal through Level II.

## II.  DISCUSSION

### A.  Summary Judgment Standard

Under Rule 56, summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue of material fact exists only where the record, taken as a whole, could lead a reasonable jury to return a verdict in favor of the nonmoving party.  *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).[8]  In making that determination, the court must take "the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).

A party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Moreover, "[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."  *Id.* at 247–48.  Instead, the non-moving party must produce "significantly probative" evidence from which a reasonable jury could return a verdict in his favor.  *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 930 (4th Cir. 1990) (quoting *Anderson*, 477 U.S. at 249–50).

---

[8]  Internal citations, alterations, and quotation marks are omitted throughout this opinion, unless otherwise noted.  *See United States v. Marshall*, 872 F.3d 213, 217 n.6 (4th Cir. 2017).

**B.   Exhaustion**

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).  "[E]xhaustion is mandatory under the PLRA and . . . unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007) (citing *Porter v. Nussle*, 534 U.S. 516, 524 (2002)).  Nor may this court "excuse a failure to exhaust." *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016).  "'[T]he language of section 1997e(a) clearly contemplates exhaustion prior to the commencement of the action as an indispensable requirement, thus requiring an outright dismissal [of unexhausted claims] rather than issuing continuances so that exhaustion may occur.'" *Carpenter v. Hercules*, No. 3:10-cv-241, 2012 WL 1895996, at *4 (E.D. Va. May 23, 2012) (quoting *Johnson v. Jones*, 340 F.3d 624, 628 (8th Cir. 2003)).  The exhaustion requirement "allow[s] a prison to address complaints about the program it administers before being subjected to suit, reduc[es] litigation to the extent complaints are satisfactorily resolved, and improve[es] litigation that does occur by leading to the preparation of a useful record." *Jones*, 549 U.S. at 219.

A prison official has the burden to prove an inmate's failure to exhaust available administrative remedies.  *Jones*, 549 U.S. at 216.  An inmate's failure to follow the required procedures of the prison's administrative remedy process, including time limits, or to exhaust all levels of administrative review is not "proper exhaustion" and will bar the claim. *Woodford v. Ngo*, 548 U.S. 81, 90 (2006).  However, "an administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008).  "[W]hen prison officials prevent inmates from using the administrative process . . . the process that exists on paper becomes

unavailable in reality." *Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006).  Once a defendant

presents evidence of a failure to exhaust, the burden of proof shifts to the inmate to show, by a

preponderance of the evidence, that exhaustion occurred or administrative remedies were

unavailable through no fault of the inmate.  *See, e.g., Tuckel v. Grover*, 660 F.3d 1249, 1254

(10th Cir. 2011).

### C.   Jamison's Exhaustion and Failure to Exhaust

As described in the factual section above, to fully exhaust his grievances under OP 866.1,

Jamison was required to follow all the steps of that procedure, beginning with the informal

complaint process, continuing with a regular grievance addressed at Level I, and then completing

at least a Level II appeal (and sometimes Level III, although Level III review was not available

here).  As noted above, Jamison did not *properly* exhaust any claims that arose during his brief

stay at Nottoway.  Instead, both grievances he filed were rejected because he did not attach a

processed informal complaint form.  He did not appeal either of those intake decisions, nor did

he resubmit his second grievance with the appropriate informal complaint, as Lewis advised him

to do.  Moreover, he never appealed any grievance to Level II.  Because he failed to properly

exhaust his remedies, consistent with OP 866.1, he cannot bring claims for events arising at

Nottoway in this suit.  *See Woodford*, 548 U.S. at 90.

Jamison contends, though, that Lewis told him none of his grievances would be filed and

that Lewis prevented him from filing his grievances, because Lewis rejected the two grievances

he attempted to file, and because at least seven of his informal complaints were rejected as

duplicative.  Given the entirety of the record, though, Jamison has not set forth facts from which

a reasonable jury could conclude that administrative remedies were unavailable to him.  In

particular, Jamison does not allege that he attempted to refile the grievance with the proper

informal complaint attached, as Lewis instructed him to do.  Nor does he allege that he attempted

to appeal the intake decision and was prevented from doing so.  He does not allege that he was denied forms for filing or that the reasons given for the denial of the two grievances were false or improper.  Instead, based on the record before the court, it appears clear that he simply did not follow procedure.[9]  Jamison's general assertion that he was discouraged or prevented from filing grievances, without any specific evidence to show that occurred, at what point, is insufficient to show that the administrative remedy was unavailable to him.  *See Pickens v. Lewis*, No. 1:15-CV-275-FDW, 2017 WL 3277121, at *4 (W.D.N.C. Aug. 1, 2017) (collecting authority from within the Fourth Circuit and elsewhere holding that "unsubstantiated and conclusory assertions by prisoner-plaintiffs that prison grievances were hindered, without providing any details regarding the date the alleged grievances were submitted or to whom they were submitted, fail to create a genuine issue of material fact sufficient to withstand summary judgment").

Thus, Jamison cannot overcome defendants' evidence concerning his failure to exhaust at Nottoway, and he has not shown a genuine issue of material fact that the grievance process was unavailable.  All claims arising from Nottoway must be dismissed, as must Assistant Warden Schlobohm, the only remaining Nottoway defendant, after Jamison voluntarily dismissed Call and Allen.

Turning to his attempts at exhaustion at Dillwyn, Jamison properly exhausted only one of his claims against these defendants.  Specifically, as discussed above, he exhausted claims that he needed to be prescribed a gluten-free diet, that Dr. Ohai and Nurse Morgan improperly took

---

[9]  Jamison was transferred to Dillwyn days after Lewis returned his second grievance, but courts within the Fourth Circuit have held that a transfer to another institution does not excuse a prisoner from exhausting his remedies.  *Lamerique v. United States*, No. 3:18-CV-00532, 2019 WL 2932673, at *9 (S.D.W. Va. June 14, 2019), *report and recommendation adopted,* No. CV 3:18-0532, 2019 WL 2929035 (S.D.W. Va. July 8, 2019) (holding that a plaintiff's duty to exhaust was not excused by his transfer to another institution and collecting authority holding same).

away his diet order in July 2018 after he purchased items containing gluten from the commissary, and that the disciplinary charge against him was retaliatory.

What Jamison failed to properly exhaust before filing this lawsuit, however, is any claim that, during the time that he was prescribed a medical diet, kitchen staff failed to give him one. "[T]o satisfy the exhaustion requirement, grievances generally need only be sufficient to alert the prison to the nature of the wrong for which redress is sought." *Wilcox v. Brown*, 877 F.3d 161, 167 n.4 (4th Cir. 2017). A person reviewing the grievance documents that Jamison pursued to Level II would not be alerted that he was claiming that the kitchen workers were not complying with a prescribed diet order. *See id.*

Jamison suggests that he repeatedly brought this issue to the attention of individuals at Dillwyn and elsewhere, which appears to be undisputed. But that does not mean that he properly exhausted the issue, as he must do before filing suit in federal court, by the plain language of the PLRA. *See, e.g.*, *Ross*, 136 S. Ct. at 1854–55 (noting that the PLRA "mandates that an inmate exhaust 'such administrative remedies as are available' before bringing suit to challenge prison conditions" (quoting 42 U.S.C. § 1997e(a))); *Anderson v. XYZ Corr. Health Servs., Inc.*, 407 F.3d 674, 675 (4th Cir. 2005) (stating that the PLRA requires exhaustion "before filing an action").

To summarize, the court finds that Jamison properly exhausted his claim that he was denied a gluten-free diet order and that he was removed from his gluten-free diet in and around July 2018. To the extent that condition continued, moreover, he was not required to continue filing grievances about the same issue so long as the "objectionable condition is continuing." *Wilcox*, 877 F.3d at 167 n.4. But Jamison failed to exhaust, before filing suit, any claim that kitchen personnel or others were not giving him the proper trays required by any medical diet order.

17

The court notes advises Jamison, though, that if he properly and fully exhausted any such claims about the kitchen workers failing to comply with the physician's orders *after* filing this lawsuit, or if he does so in the future, then he may file a new lawsuit based on those allegations, subject to the applicable statute of limitations.

**D.   Defendants Are Entitled to Summary Judgment as to Jamison's Exhausted Claim That a Gluten-Free Diet Was Never Ordered or Was Improperly Revoked**[10]

Because he has exhausted his claim that he was not given a gluten-free diet order and then his order was revoked after he purchased gluten-containing items from the commissary, and because he need not name any specific persons responsible in his grievance,[11] this arguably could be construed as being brought against the Dillwyn defendants (Ratliffe-Walker, Jones, J.D. Oates, Townes, M.E. Morgan, and Powell), as well as defendants Clarke, Amonette, and Gregg. The court construes this as a claim by Jamison that he was denied necessary medical treatment.[12]

"It is beyond debate that a prison official's deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment under the Eighth Amendment." *Gordon v. Schilling*, 937 F.3d 348, 356 (4th Cir. 2019). To demonstrate deliberate indifference, an inmate must show that (1) he has a medical condition that has been "diagnosed by a physician as

---

[10]   The VDOC defendants also argue that the claims against Clarke, Amonette, Oates, and Schlobohm should be dismissed because Jamison has not set forth facts showing they were sufficiently involved in any violation of his Eighth Amendment rights, nor any fact to hold them liable under a supervisory liability theory. (*See* Mem. Supp. Mot. Summ. J. 21–22 & n.1, Dkt. No. 85.) The court agrees, for the basic reasons set forth in the VDOC defendants' motion, although the Amonette will be kept in the case in his official capacity, solely for purposes of effecting any injunctive relief. *See infra* Section II.D. Accordingly, those defendants are entitled to summary judgment on this ground, as well.

[11]   *Moore v. Bennette*, 517 F.3d 717, 726 (4th Cir. 2008) (where the state's grievance policy did not require that specific persons be identified as responsible for the challenged conduct, the prisoner was not required "to identify specific individuals in his grievances").

[12]   Jamison's unexhausted claim--that defendants failed to provide a proper gluten-free diet even when one was ordered by his physician—would more properly be construed as an Eighth Amendment conditions-of-confinement claim. *See Scinto v. Stansberry*, 841 F.3d 219, 233–34 (4th Cir. 2016) (analyzing claim that warden denied plaintiff-prisoner a medically prescribed diet for his diabetes as an Eighth Amendment conditions claim).

mandating treatment or is so obvious that even a lay person would easily recognize the necessity

for a doctor's attention" and (2) the defendant "had actual knowledge of the plaintiff's serious

medical needs and the related risks, but nevertheless disregarded them." *Id.* at 356–57. The first

component is an objective inquiry; the second is subjective. *Heyer v. U.S. Bureau of Prisons*,

849 F.3d 202, 209–10 (4th Cir. 2017).

First, as to defendants Clarke, Amonette, and Oates, Jamison has failed to allege facts

showing that they were personally involved in any violation of his rights. *See supra* note 10.

Thus, the claims against them fail for this reason. As to the Dillwyn defendants and Gregg, the

court assumes—only for purposes of this opinion—that Jamison has put forth sufficient proof of

the objective element. Even so, he cannot establish deliberate indifference on the part of these

defendants. Critically, none of those personnel are medical staff: Townes, Morgan, Powell, and

Gregg played different roles in food service, and Ratliffe-Walker and Jones were the warden and

assistant warden, respectively.

To bring a denial of medical treatment claim against a non-medical prison official, an

inmate must show that the official was personally involved with a denial of treatment,

deliberately interfered with a prison doctor's treatment,[13] or tacitly authorized or was indifferent

to the prison doctor's misconduct. *Miltier v. Beorn*, 896 F.2d 848 (4th Cir. 1990), *abrogated on

other grounds by Farmer v. Brennan*, 511 U.S. 825 (1994). Importantly, moreover, non-medical

prison officials are entitled to rely on medical staff to make proper medical judgments; they

"cannot be liable for the medical staff's diagnostic decisions" and "cannot substitute their

judgment for a medical professional's prescription." *Meloy v. Bachmeier*, 302 F.3d 845, 849

(8th Cir. 2002); *Miltier*, 896 F.2d at 854 (explaining that non-medical staff at a prison are

---

[13] As already noted, claims that these defendants deliberately interfered with a prescribed diet order were
not exhausted and so are not before the court.

entitled to rely on the opinion of medical staff as to whether the plaintiff needed additional medical care and/or testing); *see also Kinser v. Pszczolkowsi*, No. 1:16cv8, 2016 WL 11268257, at *8 (N.D.W. Va. Oct. 19, 2016) (applying same principle in concluding that non-medical correctional staff were entitled to rely on the medical staff's determination as to whether plaintiff's medical condition required a therapeutic diet). Further, a non-physician is not "deliberately indifferent simply because [he] failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor." *Pearson v. Prison Health Serv.*, 850 F.3d 526, 539 (3d Cir. 2017).

Here, it is undisputed that none of these defendants have the authority to prescribe or order special diets based on medical reasons. Put differently, none of them could have overruled Dr. Ohai's decision to withdraw his gluten-free diet order, nor could any of them have ordered a special medical diet be provided to Jamison. Thus, to the extent that they were simply implementing the medical provider's orders, they were entitled to rely on the medical staff and cannot be liable under the Eighth Amendment. For these reasons, summary judgment will be entered in favor of the remaining VDOC defendants as to all claims, except for Amonette, who the court discusses next.

## D. Defendant Amonette

Although the individual-capacity claims against Amonette are subject to dismissal, both because they are unexhausted and because he lacked sufficient personal involvement as to the exhausted claims, the official-capacity claims against Amonette are not on the same footing. Jamison continues to contend that he still has not received a proper gluten-free diet, and he is seeking declaratory and permanent injunctive relief in this suit. Moreover, Amonette is a medical professional who took it upon himself, after the lawsuit was filed, to order a gluten-free diet for Jamison. Thus, unlike the other defendants dismissed by this ruling, Amonette apparently has

the authority to initiate and keep in place a gluten-free diet order, if the court were to so order on the claims against the medical defendants.

Accordingly, although the claims against Amonette in his individual capacity are being dismissed, the claims for declaratory and injunctive relief against Amonette in his official capacity will remain in the case at this time. *See McBurney v. Cuccinelli*, 616 F.3f 393, 399 (4th Cir. 2010) (explaining that a state officer, if he has a "special relation" to the sought injunctive relief, may be sued in his official capacity to ensure that any "federal injunction will be effective"); *see also Rountree v. Clarke*, No. 7:11CV00572, 2015 WL 102186, at *2 (W.D. Va. Mar. 9, 2015) (leaving the prison's warden as a defendant to ensure that there is an official-capacity defendant in the case that can be ordered to implement any injunctive relief granted).

## III. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment (Dkt. No. 84) will be granted, except as to the official-capacity claims against Amonette, which remain in the case. An appropriate order will be entered.

Entered: September 28, 2020.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge