IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

DANIEL W. JAMISON,                              )
      Plaintiff,                                )           Civil Action No. 7:18-cv-00504
                                                )
v.                                              )
                                                )           By: Elizabeth K. Dillon
HAROLD W. CLARKE, *et al.*,                     )               United States District Judge
      Defendants.                               )

**MEMORANDUM OPINION**

Plaintiff Daniel W. Jamison, a Virginia inmate proceeding *pro se*, brought this lawsuit alleging violations of his federal and state constitutional rights and included a state-law claim alleging he was assaulted during a medical exam.  In a September 28, 2020 memorandum opinion and order, the court addressed a motion for summary judgment filed by a number of defendants.  In doing so, it dismissed many defendants and dismissed some of Jamison's claims.

Currently pending before the court and addressed herein are another motion for summary judgment (Dkt. No. 120), Jamison's motions for preliminary injunction (Dkt. Nos. 114, 137), Jamison's motion to strike the affidavit of dismissed defendant Gregg (Dkt. No. 134), and Jamison's "objections" to the court's prior summary judgment ruling (Dkt. No. 142).  The summary judgment motion seeks judgment on all remaining claims and was brought by the following seven defendants  (collectively the "Medical Defendants"):  Leon Dixon, M.D.,[1] Erika Young, D.O., Nurse Padraig McCabe, Nurse Cynthia Morgan, Nurse Hytie House, Nurse Wileen Ford, and Paul Ohai, M.D.[2]

---

[1]  Counsel filed a notice informing the court that Dr. Dixon died on September 11, 2020.  Any party may seek to substitute his estate, or other appropriate party, by filing a motion within thirty days after entry of the accompanying order.  This court nonetheless dismisses the claims against him (or any appropriate substitute).

[2]  In the text of the Medical Defendants' motion, House is not included as a party bringing the motion. Counsel filed the motion on the docket on behalf of her, however, and she is also listed in the supporting memorandum.  (Dkt. Nos. 119, 120.)  The court thus treats the motion as being brought on behalf of House, as well.

Those defendants can be further divided into two groups, based on the facility where they worked when they treated (or allegedly failed to treat) Jamison. Jamison was housed at Nottoway Correctional Center from March 20, 2018, to May 16, 2018, and the Nottoway Defendants are Dr. Dixon, Dr. Young, Nurse McCabe, and Nurse Ford. He was then transferred to Dillwyn Correctional Center, where defendants Dr. Ohai, Nurse Morgan,[3] and Nurse House (collectively the Dillwyn Defendants) worked. He was housed there until August 2019, when he was transferred to Deerfield Correctional Center. The only other defendant in the case is Mark Amonette, a physician and the Chief Medical Director of VDOC, who the court retained as a defendant solely for purposes of granting any permanent injunctive relief.

For the reasons set forth herein, the court concludes that the motion for summary judgment should be granted as to all claims against all defendants, except for the Eighth Amendment deliberate indifference claim against Dr. Ohai. The court also will deny Jamison's motions for injunctive relief and will deny Jamison's motion to strike Gregg's affidavit. Lastly, the court briefly addresses Jamison's "objections," construes them as a motion pursuant to Federal Rule of Civil Procedure 54(b), and will deny the motion.

## I.   BACKGROUND

### A.   Factual Overview and Legal Claims in Jamison's Complaint[4]

In general terms, Jamison claims that, before he entered VDOC's custody, he was diagnosed with celiac disease, which is "an autoimmune disorder" "in which gluten[, a protein found in wheat, rye, barley, and some other grains,] triggers immune system activity that damages the lining of the small intestine. Over time, this damage prevents the absorption of

---

[3] One of the dismissed defendants, a member of Dillwyn's kitchen staff, is also named Morgan. Whenever a reference is to Cynthia Morgan, the court will refer to her as Nurse Morgan.

[4] The court permitted Jamison to file a supplemental complaint (Dkt. No. 102), but only to add an assault claim against defendant Dr. Ohai. (*See* 02/10/2020 Mem. Op. 3–4, 8, Dkt. No. 100; Order ¶¶ 3–4.)

nutrients from food." (Medical Info from Mayo Clinic, Dkt. No. 133-1 at 1; *see also* Dkt. No. 114-1 at 13 (defining gluten).) Jamison describes it as a "pre-[cancerous] digestive disorder" (Compl. 9, Dkt. No. 1) and submits documentation discussing celiac disease, stating that persons who have it also have an increased rate of intestinal cancer. (Dkt. No. 114-1 at 2.) The same information explains that "establishing an accurate diagnosis can be difficult" because "the symptoms mimic those of many other digestive disorders." (*Id.*) The established treatment for celiac disease is a gluten-free diet, which means that all foods that do not contain gluten may be consumed. (*Id.*; *see also id.* at 13.) Jamison also claims to have an allergy to chicken, in addition to other medical issues, many of which he attributes to his underlying celiac disease.

Jamison alleges that, during his time at both Nottoway and Dillwyn, the Medical Defendants failed to treat him for his celiac disease by refusing to order that he be given a gluten-free diet or otherwise adequately treating his other symptoms. He alleges that, as a result, he repeatedly was faced with the prospect of either going hungry or eating food that would make him very ill. Specifically, when he eats foods containing gluten, he experiences significant physical symptoms and pain, including frequent blood in his stool, vomiting blood, severe and painful cramping, diarrhea, lethargy from the "lack of nutrients and vitamins," and headaches. (Compl. 26.)

Jamison's complaint contains three counts. Count I is a § 1983 claim alleging a violation of his Eighth Amendment rights based on the denial of medical care. He asserts this count against all defendants and claims that their failure to provide adequate medical care constituted deliberate indifference to his serious medical needs. (Compl. 39.) Count II, also asserted against all defendants, is also a § 1983 claim alleging violations of the Eighth Amendment.[5] (*Id.* at 40.)

---

[5] Count II also included a claim alleging violations of article 1, Section 9 of the Virginia Constitution, but the court already has dismissed his state constitutional claim. (Mem. Op. 3 n.4, Dkt. No. 135.)

This count again references "medical care."  As against the non-medical personnel already dismissed from the case, the court had construed the claim as asserting a conditions-of-confinement claim based on not being given a gluten-free diet.  As against the medical personnel, however, the court concludes that it is best construed as part of his claim that the medical providers were deliberately indifferent to his serious medical needs.  Count III simply asks for equitable and declaratory relief.

The court also permitted Jamison leave to amend to add a single additional claim against Dr. Ohai.  In this claim, Jamison alleges that he was "sexually assaulted" during a rectal exam by Dr. Ohai on July 3, 2018, although Jamison concedes that he consented, including in writing, to the procedure itself.[6]

The Medical Defendants contend that they are entitled to summary judgment on a number of grounds.  As to the medical care provided Jamison, they insist that they did not violate the Eighth Amendment and instead complied with the standard of care in Virginia.  With regard to treatment of Jamison's celiac disease at Dillwyn, in particular, defendants aver that "[a]ny issues [Jamison] may have with food allergies or gluten sensitivity or celiac disease are not so severe that he could not maintain his weight by eating foods that remain in the regular jail diet that he can eat.  This is confirmed by the stability of his weight during the time" of treatment. (Dr. Ohai Decl. ¶ 20, Dkt. No. 121-1; Dr. Ohai Supp. Decl. ¶ 8, Dkt. No. 131-1; Nurse Morgan Decl. ¶ 10, Dkt. No. 121-2 (offering same opinion).)   As to the assault claim, Dr. Ohai emphasizes that Jamison gave consent for the rectal exam and has testified that the exam was performed in a typical fashion and consistent with the standard of care.

---

[6] Jamison continues to refer to "retaliation" by Nurse Morgan.  His supporting allegations did not state a First Amendment retaliation claim, however, and the court previously dismissed without prejudice Jamison's retaliation claim against Nurse Morgan.  (Mem. Op. at 4, Dkt. No. 100.)

**B.  Evidence Considered on Summary Judgment**

In support of their motion, the Medical Defendants submitted declarations from Dr. Ohai and Nurse Morgan and also have included significant portions of Jamison's medical records.[7] Jamison's complaint is a verified complaint, so the court treats the factual averments in it, if based on personal knowledge, as evidence in opposition to the summary judgment motion. *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991).[8]  Additionally, Jamison's opposition (Dkt. No. 128) and his sur-reply (Dkt. No. 133)—which he did not seek leave to file, but which the court has considered—also are signed and sworn to under penalty of perjury.  Thus, to the extent that those documents set forth facts within his personal knowledge, the court also treats those facts as Jamison's summary judgment evidence.  The court also has considered other exhibits to which Jamison points and incorporates throughout his filings.  Furthermore, where necessary to set forth additional, relevant background or context, the court incorporates facts contained within its prior memorandum opinion, which drew from various affidavits submitted by the already-dismissed VDOC Defendants.

More detailed facts relevant to the specific claims against specific defendants are addressed in the context of addressing each claim.

---

[7]  Portions of the medical records have been attached to numerous filings in this case.  Because the set of records submitted with the Medical Defendants' summary judgment motion is on a disk and the pages are not separately numbered, this opinion primarily cites to other docket entries for easier retrieval.  References to records on the disk (on file with the clerk) are designated by "Med. R" and use the page numbers of the document viewer.

[8]  Internal citations, alterations, and quotation marks are omitted throughout this opinion, unless otherwise noted.  *See United States v. Marshall*, 872 F.3d 213, 217 n.6 (4th Cir. 2017).

## II.  DISCUSSION

### A.  Summary Judgment Standard

Under Rule 56, summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue of material fact exists only where the record, taken as a whole, could lead a reasonable jury to return a verdict in favor of the nonmoving party.  *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).  In making that determination, the court must take "the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).

A party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Moreover, "[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."  *Id.* at 247–48.  Instead, the non-moving party must produce "significantly probative" evidence from which a reasonable jury could return a verdict in his favor.  *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 930 (4th Cir. 1990).

### B.  Specific Claims and Defendants

#### 1.  Legal Standards Governing Eighth Amendment Claims of Deliberate Indifference

"It is beyond debate that a prison official's deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment under the Eighth Amendment."  *Gordon v. Schilling*, 937 F.3d 348, 356 (4th Cir. 2019).  To demonstrate deliberate indifference, an inmate must show that (1) he has a medical condition that has been "diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention" and (2) the defendant "had actual knowledge of the plaintiff's serious

medical needs and the related risks, but nevertheless disregarded them." *Id.* at 356–57.  The first

component is an objective inquiry; the second is subjective.  *Heyer v. U.S. Bureau of Prisons*,

849 F.3d 202, 209–10 (4th Cir. 2017).  The subjective component requires "subjective

recklessness" in the face of the serious medical condition.  *Farmer v. Brennan*, 511 U.S. 825,

839–40 (1994).  "True subjective recklessness requires knowledge both of the general risk, and

also that the conduct is inappropriate in light of that risk."  *Rich v. Bruce*, 129 F.3d 336, 340 n.2

(4th Cir. 1997).  To qualify as deliberate indifference, then, the health care provider's treatment

"must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be

intolerable to fundamental fairness."  *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990),

*overruled in part on other grounds by Farmer*, 511 U.S. at 837.

## 2.   **Eighth Amendment Claim Against Nottoway Defendants**[9]

As noted above, the events alleged in Jamison's complaint took place at two different

institutions.  For about a seven-week period from March 20, 2018, to May 16, 2018, Jamison

was housed at Nottoway.  Jamison alleges that while at Nottoway, he repeatedly requested a

gluten-free diet.  He was told the facility did not offer one and he was never given one.

His medical records reflect that he first mentioned gastrointestinal issues to medical

personnel on April 23, 2018.  He specifically noted diarrhea, and he was instructed to avoid

gluten.  On May 3, 2018, he complained of blood in his underwear and noted that he had

hemorrhoids.  Medical staff evaluated him and concluded he had a hernia under his belly button

on the right side and confirmed that he had hemorrhoids.  He was prescribed hemorrhoid

---

[9]  In addressing the VDOC Defendants' summary judgment motion, the court concluded that Jamison failed to exhaust his administrative remedies as to any claims arising at Nottoway.  But "[f]ailure to exhaust is an affirmative defense under the" Prison Litigation Reform Act, *Jones v. Bock*, 549 U.S. 199, 216 (2007), and the Medical Defendants have not argued it in their summary judgment motion.  Thus, the court does not base its rulings as to the Medical Defendants, either in whole or in part, on a failure to exhaust.

ointment.  On May 9, 2018, he complained of abdominal pain and rectal bleeding since May 3, 2018.  At the time, he did not appear to be in any distress and he weighed 204 pounds. Nonetheless, medical staff ordered a hemoccult stool test, which was done on May 11, 2018. That test revealed blood in Jamison's stool, and he was to be scheduled for a follow-up appointment with a physician.  Before that follow-up appointment could occur, however, Jamison was transferred to Dillwyn on May 16, 2018.

Summarizing these facts, then, there were approximately three weeks between the time anyone in the medical department at Nottoway learned of Jamison's complaints of symptoms and the time he was transferred to Dillwyn.  During that time, Jamison had two medical appointments, a test was ordered and performed, and he was scheduled for a follow-up appointment.  In light of his description of symptoms, the short time available to treat him, and the fact that the Nottoway Defendants ordered tests, provided some treatment, and scheduled follow-up appointments, no reasonable jury could conclude that the treatment provided by the Nottoway Defendants was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness."  *See Miltier*, 896 F.2d at 851.  Because the undisputed facts show that no one at Nottoway was deliberately indifferent to Jamison's medical needs, then, summary judgment will be entered in favor of the following defendants, all from Nottoway: Dixon, Young, McCabe, and Ford.

**3.  Eighth Amendment Claim Against Dillwyn Defendants**

**a.  Relevant Facts Concerning Jamison's Medical Treatment at Dillwyn**

Jamison was transferred to Dillwyn on May 16, 2018, and he remained there until August 2019.  Upon his arrival, his vital statistics were unremarkable and his weight was 214 pounds. The records indicated a history of gastro-esophageal reflux disease (GERD), lumbar spine fusion, gluten disorder, and allergies to chicken and penicillin.  While at Dillwyn, Jamison

received frequent medical treatment for various conditions.

Jamison was first seen by Dr. Ohai on June 8, 2018, after he reported that he was vomiting and there was blood in his vomit, and he was evaluated for mild tenderness in his epigastric and lower left quadrant. Jamison reported during his appointment that he had been vomiting blood, and he complained of loose stools and intermittent abdominal pain. At the time, Jamison reported a history of celiac disease and noted that he previously had been diagnosed with celiac disease. Dr. Ohai prescribed Jamison several medications (three daily medications and an immediate intramuscular injection of Phenergan 25 mg) and ordered several laboratory tests. Dr. Ohai informed Jamison that VDOC did not offer any specific gluten-free diet; instead, Dr. Ohai advised Jamison to simply avoid gluten when it was served. Nonetheless, Dr. Ohai informed the dietary service of Jamison's gluten sensitivity and poultry allergy. Jamison was instructed to follow up in 4 to 6 weeks.

The medical records and defendants' motion contain significant detail about each time Jamison complained, what Dr. Ohai did each time, and what treatment Jamison received. The court sets forth some of that detail below. Summarizing it, from June 8, 2018, through July 3, 2018, Jamison complained repeatedly of various symptoms that he attributes to celiac disease. These include having blood in his underwear, vomiting blood, frequent vomiting, and severe abdominal pain. He was also seen for multiple sores on his scalp, which Jamison (and later, an outside dermatologist) also attributed to celiac disease. He was seen by Dr. Ohai on several occasions and by other medical personnel during this period. He was once referred to the emergency room. Repeatedly, his vital statistics were normal, he generally appeared well and hydrated, and his weight was not varying greatly.[10] Despite Jamison's self-reports of blood in

---

[10] With regard to Jamison's weight, his first weight at Dillwyn was 214 pounds in mid-May. The first time he complained and was seen by Dr. Ohai, on June 8, 2018, the records show that his weight was 201 pounds. On June 13, 2018, it was back up to 214 pounds. About a week later (on June 22), his weight was 211 pounds; a month

his vomit or stool, none was observed by medical personnel, including in vomit he saved and showed to Dr. Ohai and a nurse on June 19, 2018.  He was repeatedly given advice about his diet, such as avoiding gluten and drinking more water.  During several of these visits, Dr. Ohai ordered tests and prescribed medicines.

On June 22, for example, Jamison saw Dr. Ohai and reported that he was throwing up every meal and had rectal bleeding for the past six months.  Jamison complained that it got worse when Dr. Ohai took him off Prilosec.  After Dr. Ohai stated that he would not prescribe a gluten-free diet and when Dr. Ohai began discussing next steps, Jamison stated that Dr. Ohai's license should be taken away and abruptly left.  Dr. Ohai nonetheless ordered medications for Jamison.

On June 29, after Jamison complained of vomiting blood and severe abdominal pain, Dr. Ohai ordered that he be taken to the emergency room at VCU Medical Center.  The ER notes reflected that Jamison appeared well and that he did not show any signs of an acute surgical abdomen.  (Dkt. No. 92-1 at 29.)  Dr. Ohai states that VCU did not report any abnormal lab results.  As part of the discharge instructions, however, there is general information about both gastritis and celiac disease.  The same instructions include a handwritten note, apparently signed by a physician—the name is illegible, but it ends with, "M.D."—stating, "Strict Gluten Free Diet."  (*Id.* at 36.)  Although Dr. Ohai did not initial that page or all of the pages of that ten-page discharge report, he initialed some of them, apparently signaling that he had reviewed them.  (*Id.* at 31; *see also id.* at 32, 35.)  The ER physician also recommended that Jamison be sent for an appointment with the GI Clinic (Dkt. No. 92-1 at 24, 29, 30), and Dr. Ohai's initials appear on one of those pages.

---

after that (on July 18), it was 206 pounds; the following month (August 14, 2018), his weight was 216 pounds.  On later visits, he weighed 206 pounds (August 27), 207 pounds (September 18), 220 pounds (January 16, 2019), and 210 pounds (January 31, 2019).  In response, Jamison claims that his weights either were not recorded when they were low or cannot be properly compared because his baseline weight was calculated without his wearing restraints, and later times, he was weighed with restraints, which obviously added pounds.

On July 3, 2018, Jamison again complained of vomiting and rectal bleeding, but again, both were unwitnessed. His examination revealed a normal appearance, he was well hydrated, his stool was negative for occult blood on that date, and he had not lost weight. With Jamison's written consent, Dr. Ohai performed a digital rectal exam that did not reveal any blood or other problems. Dr. Ohai explains that did not see any reason for a GI consult at that time and instructed Jamison to avoid foods containing gluten. Then, on July 4, after reports of Jamison continuing to order gluten foods from the commissary, Dr. Ohai discontinued the order for a special diet for Jamison. (*Id.* ¶ 12.)[11] Dr. Ohai saw Jamison again on July 18 for the bumps on his head and his continued complaints of chronic gastritis.

Dr. Ohai saw Jamison again on August 14, but prior to that date, another physician (Hammond) apparently ordered a celiac test for Jamison in late July 2018. Specifically, a lab report issued on August 2, 2018, for a blood sample collected from Jamison on July 27, 2018. That report showed that Jamison's results for tTG Ia were a 17, and the note explained that anything greater than 10 indicated a positive result.[12] Moreover, the report contained a note immediately below that result explaining that tTG has been identified as the "endomysial antigen" and stating that "Studies have demonstrated that endomysial IgA antibodies have over 99% specificity for gluten sensitive enteropathy." (Dkt. No. 92-1 at 1.)

---

[11]   As noted in the court's prior memorandum opinion, it is unclear the precise diet orders that Jamison had at Dillwyn and when. The VDOC employees offered affidavits that, upon Jamison's arrival, the medical department submitted a diet order stating that he was to receive an allergy diet with no "chicken or gluten." (Morgan Aff. ¶ 5, Encl. B, Dkt. No. 85-6; Townes Aff. ¶ 4, Dkt. No. 85-5.) But Dr. Ohai's declaration states that, during an appointment on July 3, 2018, he advised Jamison that VDOC "does not provide gluten free diets for other inmates with proven [c]eliac, [c]eliac disease variants and possible IBD." (Ohai Decl. ¶ 11, Dkt. No. 121-1.) In any event, it is undisputed (at least as between Jamison and the Medical Defendants) that whatever diet order was in Jamison's file was ordered to be removed by Dr. Ohai on July 4 and that no other special diet order was implemented for him again until September 14. Moreover, Jamison complains that Dr. Ohai's order for a wheat-free diet (and VDOC's alleged subsequent substitution of a wheat-free diet when a gluten-free diet was finally ordered for him) does not alleviate his symptoms or adequately treat him. And he attaches medical literature explaining that gluten is found in substances other than wheat.

[12]   Jamison's results also had "high" results for deamidate Gliadin Abs, IgA and Deamidate Gliadin Abs, IgG. (Dkt. No. 92-1 at 1.) The significance of those is not discussed in the document.

The Medical Defendants do not refer to or explain those tests results, despite the fact that Jamison pointed to them in his summary judgment response.  Importantly, moreover, Dr. Ohai does not offer any explanation as to if or when he reviewed this lab report or why the test results are unimportant or insignificant.  He also does not state that he disagreed with those results based on the exercise of his independent medical judgment.

Jamison next saw Dr. Ohai on August 14 for a follow-up appointment.  Jamison again claimed he had blood in his stool, but there was no corroboration.  Dr. Ohai again advised Jamison to only eat foods that he thought would not upset his stomach.  Dr. Ohai attempted to treat other conditions of Jamison's such as the bumps on the scalp, which later dermatology records attribute to his celiac disease.[13]  Dr. Ohai never was able to control those or provide relief for his significant scalp pain, according to Jamison.

Also, on August 14, 2018, Dr. Ohai specifically counseled Jamison regarding his diet, encouraging him to eat only those food items that he believes will not bother him.  Jamison responded that he already does this, but instead wanted a "food pass," which appears to be just a medical order for a gluten-free diet.  Dr. Ohai refused to give him one because Jamison could avoid gluten foods but, instead, based on reports and records of his commissary purchases, was continuing to eat foods from the commissary that contained glutens.  (Ohai Decl. ¶ 14.)  Again, his examination was unremarkable and a h-pylori test from his stool came back negative.  For some reason, though, on September 14, 2018, a special diet of avoiding wheat, eggs, and poultry was ordered by Dr. Ohai and placed in Jamison's file.  Dr. Ohai does not offer an explanation as to why he elected to reinstate a special diet order at that time.

On September 18, 2018, Jamison again requested a special diet order, but Dr. Ohai

---

[13] On at least one occasion, though, Dr. Ohai noted that the scalp lesions had tested positive for a staph infection, and he was appropriately treating that infection with antibiotics.  (Ohai Decl. ¶ 18.)

refused.  At that point, Jamison said he did not want any further medications or testing and

simply stated, "I will see you in court."  According to Dr. Ohai, he offered to perform the celiac

disease blood test, but Jamison declined that test, saying it was done prior to incarceration.[14]

During appointments in October 2018 and January 2019, Jamison continued to report

issues such as diarrhea and blood in his vomit.  These complaints all remained uncorroborated,

his examinations were normal, his appearance was generally healthy and not pale, and his weight

remained steady or he occasionally gained some weight.  Additionally, on October 17, 2018,

medical staff saw Jamison after he claimed that he vomited blood in the sheet metal shop

bathroom.  Blood was present, but there was no gastric material.  Security discovered a cut to

Jamison's right index finger that was still bleeding and was covered by black tape.

On January 16, 2019, Dr. Ohai ordered that Jamison's stool be tested for occult blood

three times over the next week.  About a week later, other medical staff ordered labs and x-rays

for Jamison.  After one of the stool tests ordered by Dr. Ohai was returned positive for occult

blood, Dr. Ohai referred Jamison to VCU for a GI consultation on February 2, 2019.  That

consult was later rescheduled for "security reasons."  Jamison did not have his GI consult,

however, for seven months, until September 2019, after he had transferred to Deerfield.  The

Medical Defendants have offered sworn testimony that the timing of the appointment and its

postponement were not within their control.  Jamison does not dispute that the postponement was

not within the Medical Defendants' control, but he notes that Dr. Ohai's written request for the

consult only asked for a "first available" appointment, when he could have asked for an urgent

appointment or a more expeditious one within 30 days.

On March 6, 2019, Jamison submitted a grievance form indicating that he would not see

---

[14]  As already noted, moreover, either that or a similar blood test had been ordered by a fellow physician in late July 2018, and the results presumably were in Jamison's file.

Dr. Ohai again.  Thereafter, he was only seen in medical for renewals of his medications.  On July 27, 2019, he complained of rectal bleeding, but he did not appear to be in distress.  On August 1, 2019, he was transferred to Deerfield.

Despite Jamison's insistence to his medical providers at Dillwyn that he was attempting to maintain a gluten-free diet, that assertion is disputed by other witnesses, who observed him with gluten-containing foods.  For example, Jamison was observed with an open bag of pretzels in early July 2018, shortly before Dr. Ohai discontinued his diet order.  From July 16, 2018, until September 2, 2018, when Jamison worked in the kitchen, Morgan observed Jamison first eating his special diet tray and then also eating gluten-containing food that he was instructed to avoid. After an incident in which Jamison vomited on his way to the bathroom, during his kitchen work shift, Jamison admitted to Morgan that he had eaten pizza, despite knowing he was not supposed to.  Additionally, at the time Morgan executed her affidavit in June 2019, she stated that Jamison was not requesting his wheat-free tray at meals, but instead was picking up a regular tray which contains bread items three times daily.  (Morgan Aff. ¶ 12, Dkt. No. 85-6; *see also* Townes Aff. ¶ 5–6, Dkt. No. 85-5 (also noting Jamison's picking up regular trays rather than his special trays and stating that she counseled him several times about his diet, including the incident in which he ate pizza before vomiting in the kitchen).)

Jamison filed suit in October 2018.  On September 16, 2019—almost a year later and after his transfer to Deerfield—Amonette directed that Jamison be placed on a gluten-free diet while he was "being worked up" to confirm a diagnosis.  (Dkt. No. 104-1 at 23; *see also* Gregg Aff. #2 ¶ 5 & Encl. A, Dkt. No. 126-1 (March 12, 2020 diet order signed by Amonette requiring a gluten-free diet for Jamison).)  But at least twice prior to that time—on January 8, 2019, and August 22, 2019—outside physicians noted that Jamison should be on a gluten-free diet.  Despite the order for a gluten-free diet, Jamison continues to complain that he "is not receiving a gluten-

free diet of recognized standard per policy" and blames this on dismissed defendant Gregg, as well as Deerfield's kitchen staff, who are not defendants. The continued lack of what he says is a *proper* gluten-free diet also is part of the basis for his requests for preliminary injunctive relief. Subsequent medical records show that Jamison has since had his diagnosis of celiac disease confirmed again.

### b. Deliberate Indifference Claim Against Dr. Ohai

As noted, to prevail on his deliberate indifference claim against Dr. Ohai, Jamison must prove both that he had a serious medical need and that Dr. Ohai "had actual knowledge" of that need and its "related risks, but nevertheless disregarded them." *Gordon*, 937 F.3d at 356–57. To phrase it slightly differently, Dr. Ohai must have had "knowledge both of the general risk, and also that [his] conduct [was] inappropriate in light of that risk." *Rich*, 129 F.3d at 340 n.2. To qualify as deliberate indifference, Dr. Ohai's treatment "must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier*, 896 F.2d at 851.

Furthermore, it is well recognized that "negligent medical diagnoses or treatment, without more, do not constitute deliberate indifference." *Webb v. Hamidullah*, 281 F. App'x 159, 166 (4th Cir. 2008). Likewise, a plaintiff's mere disagreement with a prescribed course of treatment is insufficient to establish an Eighth Amendment claim of deliberate indifference. *See Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) (finding that a prisoner's claim "is essentially a disagreement between an inmate and a physician over the inmate's proper medical care, and we consistently have found such disagreements to fall short of showing deliberate indifference"). If a medical provider has a legitimate medical reason for a certain course of treatment, then an inmate's disagreement with the treatment is not sufficient to succeed on an Eighth Amendment claim. *Rush v. Vandevander*, Civil Action No. 7:08CV00053, 2008 WL

15

495651, at *2 (W.D. Va. Feb. 21, 2008) (citing *Perkins v. Kansas Dep't of Corr.*, 165 F.3d 803, 811 (10th Cir. 1999)); *see also Taylor v. Barnett*, 105 F. Supp. 2d 483, 488 (E.D. Va. 2000).

As to the objective inquiry, defendants argue that Jamison has not identified a serious medical need. However, if a jury believed Jamison's reported complaints, which included frequent vomiting, blood in his vomit, continued and persistent pain, headaches, and a skin condition that was resistant to treatment, a reasonable jury could find that at least some of these symptoms (such as vomiting blood) constituted a "serious medical need." *See Scinto v. Stansberry*, 841 F.3d 219, 231–32 (4th Cir. 2016) (explaining that where plaintiff was experiencing "extreme" stomach pain, was throwing up vomit and blood, and became incontinent, this constituted a serious medical condition for Eighth Amendment purposes); *Quintana v. Santa Fe Cty. Bd. of Comm'rs*, 973 F.3d 1022, 1029–30 (10th Cir. 2020) (reasoning that although frequent vomiting alone might not qualify, an Eighth Amendment claim premised on reports to the defendant that plaintiff was vomiting blood stated an obvious serious medical need).

Turning to the subjective inquiry, and construing all facts and inferences therefrom in the light most favorable to Jamison, the key facts may be summarized as follows:

1. Dr. Ohai received repeated complaints from Jamison that, while uncorroborated and apparently believed by Dr. Ohai to be exaggerated or possibly the result of malingering, reflected that Jamison was in pain and suffering symptoms of celiac disease, and Jamison repeatedly told Dr. Ohai he had been diagnosed with celiac disease.

2. Dr. Ohai repeatedly noted that Jamison's reports of vomiting blood and other similar complaints were uncorroborated or unwitnessed, that his vital signs and appearance reflected that he was not dehydrated, pale, or obviously suffering from malnutrition.

3. With regard to Jamison's weight, Dr. Ohai considered his baseline weight to be 210 pounds, reported by the Fairfax County Jail in October 2017, and noted that his baseline weight at Nottingham was 204 pounds. During the time Jamison was at Dillwyn, his weight generally fluctuated from between 201 pounds and 220 pounds. Jamison questions the reliability of those recordings of his weight, and also points out one notable exception: on July 17, 2019, Jamison's weight was listed as 187 pounds,

16

and Dr. Ohai's signature appears at the bottom of that page.  (Dkt. No. 104-1 at 48.)
Earlier that month, his weight was recorded as 205 pounds.  (*Id.* at 49).  Less than two
months later, on September 11, 2019—which was *before* Amonette ordered a gluten-
free diet, Jamison's weight had returned to 212 pounds.  (Dkt. No. 133-1 at 25.)[15]
Based on Jamison's BMI and the fact that he had been diagnosed with Type 2
diabetes, slight weight loss would not have been considered detrimental to his health.
Indeed, at his July 18, 2018 appointment, when he weighed 206 pounds, Dr. Ohai
noted that Jamison needed "to lose another 10–15 pounds" in order to avoid needing
therapy for his Type 2 diabetes.  (Ohai Decl. ¶ 13.)

4. On many different occasions from the time of Jamison's arrival Dillwyn, Dr. Ohai
   ordered lab work and tests and also tried various treatments, mostly in the form of
   medications, including pain medication, for Jamison's gastrointestinal issues and for
   Jamison's skin problems, but without successfully treating Jamison's reported
   symptoms.  On June 29, when Jamison reported significant abdominal pain, Dr. Ohai
   directed that he be sent to the emergency room for treatment.

5. The physician who treated Jamison in the ER on June 29, 2018, recommended
   Jamison receive a GI consult.  Dr. Ohai reviewed those records on July 2, 2018.  The
   following day, though, after his own July 3, 2018 examination of Jamison, Dr. Ohai
   reached the conclusion that no GI consult was warranted.

6. A physician from the same ER visit included a note on some of the discharge
   paperwork stating that Jamison should follow a "strict gluten-free diet."  That note
   was written on one page of a set of documents, and Dr. Ohai initialed some of the
   other pages in the same set of documents on July 2, 2018.

7. As of August 2, 2018, Dr. Ohai had access to Jamison's blood work from the prior
   month showing at least that Jamison suffered from gluten sensitivity.  That lab work
   does not appear to have been ordered by Dr. Ohai, however; it lists "Hammond" as
   the ordering physician.  There also is no evidence that Dr. Ohai reviewed it, although
   the report was part of Jamison's medical record.

8. Dr. Ohai and other medical staff repeatedly directed Jamison to avoid food containing
   gluten or other foods that upset his stomach, but Dr. Ohai also repeatedly declined to
   "order" a gluten-free diet.  Instead, he informed Jamison that no gluten-free diet
   existed at VDOC.  There is significant discrepancy in various defendants' testimony
   as to whether a gluten-free diet could be ordered, and whether and when Jamison was
   actually placed on such an order or when such an order was revoked.

9. Although Jamison was ordered to be on a special diet when he arrived at Dillwyn, Dr.
   Ohai revoked that diet order in early July, after reports that Jamison was consuming
   gluten-containing products.  The diet order was not reinstated until September 14,
   2018.

---

[15]  Based on this, the 187-pound notation is an outlier and possibly erroneous.  But even if accurate, then
Jamison was able to regain twenty-five pounds over the course of two months, which would certainly undermine
any claim that the diet he was provided did not allow him to maintain his weight.

10. Jamison's commissary records reflected that he was purchasing food from the commissary that contained gluten, although Jamison claimed that he was not consuming those items, but he was trading them for food he could eat.  (Ohai Decl. ¶ 11 & Med. R., Dkt. No. 121-2.)  Jamison also was observed with an open bag of pretzels while under observation in the medical unit.  There was additional evidence (in the form of eyewitness reports and an incident in which Jamison cut his finger to make it appear that he had vomited blood) suggesting that Jamison was not being entirely truthful with his providers about his symptoms and/or the foods he was eating.

Upon a review of the evidence, and considering the entirety of the record, the court concludes that there are genuine disputes of material fact as to whether or not Dr. Ohai was deliberately indifferent toward Jamison's celiac disease.  To be sure, Dr. Ohai repeatedly examined Jamison and provided some treatment, mostly in the form of diet counseling and medications that Jamison insists failed to improve his symptoms.  But the fact that Dr. Ohai provided "some treatment" does not mean that he "necessarily provided constitutionally adequate treatment."  *See De'lonta v. Johnson*, 708 F.3d 520, 524 (4th Cir. 2013); *see also Perry v. Meade*, 728 F. App'x 180, 182 (4th Cir. 2018) (explaining that persisting in an ineffective treatment plan . . . may support a claim of deliberate indifference).  Instead, viewing all facts in the light most favorable to Jamison, there are a number of facts that could support a finding that Dr. Ohai's treatment was "grossly . . . inadequate."  *Miltier*, 896 F.2d at 851.

First, there was ample evidence that Jamison had celiac disease, including lab work from July 2018.  Despite this, Dr. Ohai continued to question whether Jamison was malingering.  In a January 16, 2019 note, for example, Dr. Ohai noted that he could find no "clear etiology" for Jamison's complained-of symptoms and "could not rule out secondary gain as a motivation" for the symptoms.[16]  (Ohai Decl. ¶ 18.)  Dr. Ohai's continuing to question that diagnosis could be

---

[16]  "Secondary gain" in psychiatry refers to "any advantage . . . obtained as a result of having an illness" or "interpersonal or social advantages gained indirectly from organic illness, such as an increase in attention from others."  Secondary gain, Dictionary.com, https://www.dictionary.com/browse/secondary-gain (last visited February 21, 2021).

viewed as deliberate indifference.  Despite the confirmed diagnosis, moreover (and despite an outside physician recommending both a gluten-free consult and a GI consult), Dr. Ohai did not follow those recommendations nor offer any explanation for not doing so.  Instead, Dr. Ohai *revoked* Jamison's diet order and failed to request a GI consult until six months later, in January 2019.[17]  There were extensive delays in that consult occurring, too, and it did not happen until September 2019, after Jamison had transferred to Deerfield.

"A mere disagreement between doctors does not establish that one doctor was deliberately indifferent."  *Hogge v. Stephens*, No. 3:09CV582, 2010 WL 3834856, at *6 (E.D. Va. Sept. 24, 2010), *aff'd,* 469 F. App'x 160 (4th Cir. 2012); *Ballard v. Daniels*, No. 5:16-CT-3012-BO, 2017 WL 1283670, at *4–5 (E.D.N.C. Jan. 13, 2017), *report and recommendation adopted,* No. 5:16-CT-3012-BO, 2017 WL 945850 (E.D.N.C. Mar. 10, 2017) ("A prison physician is not constitutionally required to follow a specialist's recommendations.").  But the Fourth Circuit also has held that a deliberate indifference claim was improperly dismissed where the plaintiff alleged that his physicians acknowledged some symptoms but ignored most, disregarded abnormal test results, and failed to treat any of his symptoms effectively.  *Jehovah v. Clarke*, 798 F.3d 169, 181–82 (4th Cir. 2015).

Similarly, although Jamison suffered from skin lesions the entire time he was at Dillwyn and although another provider at Dillwyn recommended a dermatology consult in March 2019, it took until January 2020, after he was at Deerfield, for Jamison to be seen by an outside dermatologist.  A failure to recognize that the lesions were related to Jamison's celiac disease might be mere negligence, but a reasonable jury could view the totality of the treatment Jamison

---

[17]  Although Dr. Ohai contends—and conveyed to Jamison—that there is no "gluten-free diet" at VDOC, Jamison has since been placed on one by order of Amonette.  Construing the facts in the light most favorable to Jamison, Dr. Ohai had the authority to order a special "gluten-free" diet.

received at Dillwyn from Dr. Ohai and determine that there was deliberate indifference.  Perhaps most notably, it is unclear whether Jamison was ever ordered to have a gluten-free diet by anyone at VDOC prior to September 2019.  In the meantime, he describes having to choose between hunger or suffering from significant pain and other unpleasant symptoms as a result of the lack of treatment.

Second, there is a dispute as to whether Jamison could maintain adequate nutrition by simply avoiding food containing gluten on the regular prison menu.  Dr. Ohai's primary defense is that he believed Jamison could receive a nutritionally adequate diet by eating the prison diet he was being provided and avoiding items containing gluten.  Both Dr. Ohai and Nurse Morgan have so testified.  This belief appears to be based on: (1) objective medical evidence, including Jamison's generally healthy appearance, relatively steady weight, and some test results that did not confirm the existence and/or severity of many of Jamison's complaints; (2) the fact that many of Jamison's reports of symptoms were unwitnessed or uncorroborated, that some of his vomit had been tested and had no blood in it, and that he had cut his finger on occasion to fake blood in his vomit; and (3) reports received by the medical department that Jamison continued— despite his denials to the contrary—to consume gluten-containing food.  The many informational documents submitted by Jamison (some of them given to him by outside providers) make clear that gluten may be in many foods, and a person with celiac disease should make every effort to avoid it entirely.  Although Dr. Ohai states, by way of conclusion, that is the case, he does not specify what foods Jamison could have safely eaten from the regular prison diet.

Regardless of his appearance, moreover, Jamison repeatedly complained of significant pain and other symptoms.  Additionally, weight loss is not the only way for Jamison to show that his diet was inadequate.  An Eighth Amendment claim based on a lack of adequate nutrition can be stated by allegations that the prisoner "lost weight or suffered other adverse physical effects

or was denied a nutritionally and calorically adequate diet." *Wilson v. Johnson*, 385 F. App'x 319, 320 (4th Cir. 2010) (quoting *Berry v. Brady*, 192 F.3d 504, 508 (5th Cir. 1999)).  Jamison repeatedly complained not only that that he would have gone hungry had he only eaten non-gluten containing foods, but also that he could not avoid those foods and so was sick and suffering significant symptoms.

Furthermore, as noted, there is at least one instance of a very low weight reading (187 pounds from the "baseline" described by Dr. Ohai as 210 pounds).  And Jamison has offered his own testimony that he would have gone hungry had he eaten only the food items without gluten from the diet given to him.  Additionally, some of Jamison's lab work indicates at least a folate deficiency, which could be attributed to his diet, and he has since been required to take a nutritional drink supplement (Ensure) to address other possible deficiencies.[18]  Thus, there is a dispute of fact over whether the regular prison diet—with all gluten-containing items removed and no substitutes provided—was sufficient for Jamison to maintain health and adequate nutrition.

Third, the inconsistent testimony from Dr. Ohai and other VDOC personnel over the special diet order, as well as the fact that Dr. Ohai discontinued a special diet order already in place for a period of two months (from July 2018 until September 2018), are facts that a jury could conclude support a finding of deliberate indifference.  If a diet is important to a patient for medical reasons, the fact that an individual strayed from that diet seems a strange reason to prevent the patient from having access to it and to perhaps limiting his food choices even more.  Indeed, the discontinuance of previously ordered treatment can support an Eighth Amendment violation.  *See Lightsey*, 775 F.3d at 179 (physician's act of prescribing treatment raises a fair

---

[18]  For example, his folate levels were low on September 12, 2018.  (Med. R., Dkt. No. 121, Ex. A, at 90.) He also points out that, in February 2020, he was given folate and instructed to drink one can of "ensure plus" two times per day to ensure adequate nutrition.  (Dkt. No. 104-1 at 62.)

inference that he believed treatment was necessary and that failure to provide it would pose an excessive risk).   The court also finds it significant that, although Dr. Ohai's testimony is that VDOC did not have a gluten-free diet, one was eventually ordered for Jamison by Amonette. Thus, any assertion that a gluten-free diet could not have been ordered or was unavailable is in dispute.

As already noted, the court acknowledges that Dr. Ohai and other medical staff at Dillwyn repeatedly examined Jamison, recorded his symptoms and complaints, ordered tests in an attempt to diagnose him, and made some attempts to treat his celiac disease or gluten sensitivity, both with medications and by suggesting dietary changes he could implement himself.  But according to his testimony, Jamison's symptoms continued for the entire fifteen months he was housed at Dillwyn, he complained about them repeatedly, and they were never successfully treated by Dr. Ohai or anyone else there.  And the mere fact that Dr. Ohai provided "some treatment" does not insulate him from an Eighth Amendment claim.  *See De'lonta*, 708 F.3d at 524; *Perry v. Meade*, 728 F. App'x at 182.

 In sum, if a reasonable jury were to resolve all of the identified disputes of fact in Jamison's favor, it could conclude that Dr. Ohai subjectively knew that his failure to provide other or different treatments to Jamison, including an order for a gluten-free diet, was "inappropriate conduct" in light of the evidence of Jamison's complaints and the outside physicians' instructions, at least as of July 2018.  It is entirely possible, of course, that a jury might not believe Jamison's reports, or a jury might find that Dr. Ohai was negligent, but he did not commit a constitutional violation.  *See Webb*, 281 F. App'x at 166.  But the court must view all facts and inferences from them in Jamison's favor.  Doing so, the court concludes that a jury could find in plaintiff's favor, so the claim must be allowed to go forward.  Accordingly, the court will deny the summary judgment motion as to Jamison's Eighth Amendment claim against

Dr. Ohai.

### c. Deliberate Indifference Claim Against Nurse Morgan

Nurse Morgan avers that she was the head nurse at Dillwyn during Jamison's time there. The chart indicates that she treated him only on one occasion—on October 17, 2018. On that date, she went to examine the alleged vomit containing blood on the shop floor and concluded that there was blood, but no gastric matter. She also made a note of Jamison's cut finger covered with black tape. (Nurse Morgan Decl. ¶¶ 7–8.)  Further, Jamison does not dispute that on that single occasion when she was present to provide care, he refused care at that time. These facts do not support a deliberate indifference claim.

Nurse Morgan also contends that she cannot be held liable for a deprivation of medical care or a proper medical diet when her involvement was otherwise limited to responding to Jamison's grievances. The court agrees that, given her limited involvement in Jamison's care and the well-established law that ruling against a prisoner on his grievance or informal complaint does not make a prison official liable for an underlying constitutional violation, *see Sims v. Davis*, No. 7:18-cv-00551, 2020 WL 572730, at *7 (W.D. Va. Feb. 5, 2020)*,* summary judgment in Nurse Morgan's favor is appropriate.

### d. Deliberate Indifference Claim Against Nurse House

Defendants do not discuss Nurse House separately in their motion. In his response, Jamison states only that House had direct knowledge of his celiac disease and failed to treat him. He also alleges that on July 10, 2018, when Jamison brought a sample of his vomit, she did not test it for blood but instead "destroyed the sample by flushing it" and stating it was the day's soup which Jamison did not eat. He appears to claim that she did this so she could continue to state that his claims of blood in his vomit were

23

unwitnessed.  Jamison presents no facts to support this assertion, nor does he present any evidence that Nurse House had the ability to override Dr. Ohai's determinations as to what treatment was appropriate for Jamison.  He points to nothing specific in her other treatment of him that he believes reflected deliberate indifference.  A reasonable jury could not find in his favor as to his claims against House.

### 4.  Eighth Amendment Claims Based on Indifference to Other Serious Medical Needs

In addition to Jamison's claims regarding his celiac disease—which he blames for many of his other medical issues, his complaint and supplemental complaint also allege that certain medical personnel exhibited deliberate indifference to his serious medical needs in other ways, although he himself characterized those claims as "negligence" in his supplemental complaint. In his response to the summary judgment motion, he criticizes the defendants for not providing specific treatments for other issues: "[D]efendants did not provide any treatment aids such as a Tens unit (for back), wipes for stools, wedge pillow for GERD, or absorption pads."  His response also asserts that no treatment was given for his hernias for over two years which were painful and caused him constipation; no appropriate pain management was given for his headaches, back and neck pain, stomach pain, or foot pain, and that what was given "was so cursory," such as giving Tylenol, and did not alleviate his symptoms.  (Resp. at 7–8, Dkt. No. 128.)  His supplemental complaint also included an allegation that his physicians prescribed a medication, omeprazole, the generic form of Prilosec, which he contends contains gluten and should not be prescribed for someone with celiac disease.[19]

First, to the extent that these claims merely allege negligence, negligence is not actionable under the Eighth Amendment.  *Webb*, 281 F. App'x at 166.  Further, the court has

---

[19]  Confusingly, there are several notations in his medical records where Jamison requested Prilosec and stated that it helped his symptoms.

reviewed these additional claims and considered them in light of the voluminous medical evidence in the case.  The court concludes, however, that either his complaints are not serious medical needs or the medical record does not reflect deliberate indifference on the part of defendants as it relates to these medical issues.[20]  To the extent that the symptoms of which he complains are symptoms of celiac disease, they may be relevant to his remaining Eighth Amendment claim, but they do not otherwise support an independent claim under the Eighth Amendment.

### 5.  State-law Assault or Battery Claim Against Dr. Ohai

Jamison next argues that he was "assaulted" by Dr. Ohai during the July 3, 2018 rectal exam, which the court analyzes as a state-law claim of either assault or battery, or as an Eighth Amendment excessive force claim.   It is undisputed that Jamison gave both oral and written consent for the exam, but Jamison alleges it was an unusually rough exam.  Specifically, Jamison alleges that Dr. Ohai performed the exam in a way that was forceful, painful, and degrading. Jamison also states that he has had the same exam done by other physicians and had not had the same experience nor was it as painful as the July 3 examination by Dr. Ohai.[21]

For his part, Dr. Ohai denies that he did anything out of the ordinary and instead avers that he conducted the exam in the typical manner and consistent with the standard of care.  There is no other evidence bearing on this issue—there is no affidavit from the nurse who was on the

---

[20]  For example, Dr. Ohai gave Jamison a referral to psychiatry for his PTSD.  When Jamison complained of back pain, Dr. Ohai reviewed prior records from his spinal fusion surgery and prior x-rays, ordered Cymbalta for pain relief, and ordered new x-rays.  Dr. Ohai noted Jamison's hernia and concluded that it needed clinical monitoring.  He diagnosed the scalp lesions and repeatedly ordered treatment, including antibiotics and Tylenol for pain.  When Jamison's complaints of abdominal pain and diarrhea did not subside, Dr. Ohai began to "entertain a diagnosis of Irritable Bowel syndrome that was clinically stable," and ordered additional laboratory tests and prescribed immodium.  On another occasion, Dr. Ohai offered tests or additional exams, but Jamison refused them.

[21]  Jamison also mistakenly believes that the test was positive and that Dr. Ohai "destroyed the evidence of bleeding" by not taking a picture of the results card.  Dr. Ohai explains how the test worked and that it was negative. (Dr. Ohai Supp. Decl. ¶ 5 Dkt. No. 131-1.)  Neither Jamison's erroneous understanding of the meaning of the control portion of the test nor his speculation that the test was positive creates a genuine dispute of material fact.

other side of the privacy screen, and there is no video or audio of the procedure.  Dr. Ohai notes, however—and Jamison does not deny—that Jamison did not make any sound or otherwise express discomfort during or immediately after the exam,[22] and that the nurse would have heard and reported any such statements by him.

In Virginia, battery is "an unwanted touching which is neither consented to, excused, nor justified."  *Koffman v. Garnett*, 574 S.E.2d 258, 261 (Va. 2003).  "For conduct to constitute assault, it must be intended to cause harmful or offensive contact or apprehension of that contact."  *Balas v. Huntington Ingalls Indus., Inc.*, 711 F.3d 401, 412 (4th Cir. 2013) (citing *Koffman*, 574 S.E.2d at 261).

Dr. Ohai's rectal exam of Jamison does not satisfy the elements of either tort.  There is no evidence whatsoever, other than pure speculation on Jamison's part, that Dr. Ohai intended to cause harmful or offensive contact, so it was not an assault.

Similarly, as to battery, Jamison admits that he gave written consent for the rectal exam performed by Dr. Ohai.  Where consent for a medical procedure has been given, a physician can be held liable for battery only where the physical contact of the patient was "deliberately against the patient's will or substantially at variance with the consent given."  *Mayr v. Osborne*, 795 S.E.2d 731 (Va. 2017).  Here, Jamison merely alleges that the exam was rougher than he expected or than he had previously experienced with other physicians.  That is insufficient to show that the physical contact was "substantially at variance with the consent" he gave.  *See id.* Indeed, to allow a claim of battery premised on this type of contention would render every examination or procedure that a patient perceived as unnecessarily rough a battery by the medical provider.  Summary judgment is therefore appropriate as to any assault or battery claim.

---

[22]  Indeed, Jamison did not complain about this exam until more than seven months after it occurred, submitting an informal complaint about it in February 2019.

**6.   Excessive Force Claim Against Dr. Ohai**

To the extent that Jamison's claim regarding the rectal exam could be construed as an Eighth Amendment excessive force claim (which he has not pled), it nonetheless fails.  The Eighth Amendment prohibits prison officials from inflicting unnecessary and wanton pain and suffering on prisoners.  *Whitley v. Albers*, 475 U.S. 312, 320 (1986).  To succeed on an excessive force claim, a plaintiff must show that the prison official (1) used "nontrivial" force (objective component), *Wilkins v. Gaddy*, 559 U.S. 34, 39 (2010), and (2) acted with "wantonness in the infliction of pain" (subjective component), *Whitley*, 475 U.S. at 322.

No reasonable jury could conclude that the exam performed by Dr. Ohai constituted an Eighth Amendment violation.  As to the objective component, Jamison does not allege that he suffered any lasting injury.  Instead, he merely complains that the procedure itself was uncomfortable and painful, and it certainly would not be uncommon for a rectal exam to cause some discomfort.  Further, while even a *de minimis* injury can give rise to an excessive force claim, that is not always the case.  As the *Wilkins* court explained:

> [N]ot "every malevolent touch by a prison guard gives rise to a federal cause of action." [*Hudson v. McMillian*, 503 U.S. 1, 9 (1990).]  "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Id.*, at 9–10 (some internal quotation marks omitted). An inmate who complains of a "'push or shove'" that causes no discernible injury almost certainly fails to state a valid excessive force claim. *Id.*, at 9 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)).

*Wilkins*, 559 U.S. at 37–38; *see also Henslee v. Lewis*, 153 F. App'x 179, 180 (4th Cir. 2005).  Likewise, an inmate who complains that a consented-to medical exam was performed too "roughly," despite there being no injury as a result, "almost certainly" fails to state a valid excessive force claim.  *Cf. Wilkins*, 559 U.S. at 38.

Nor has Jamison offered any evidence from which a jury could find that the subjective element of this claim. Analysis of the subjective component "ultimately turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian*, 503 U.S. 1, 6 (1992). Here, the first part of that test might be modified to ask whether force was applied in a good faith effort to conduct a medical exam. Regardless, there is no evidence that Ohai purposefully, let alone maliciously and sadistically, attempted to cause Jamison harm by performing the test in a rough fashion. Thus, Dr. Ohai is entitled to summary judgment as to any Eighth Amendment claim based on the rectal exam.

## C.  Qualified immunity

Defendants also seek summary judgment in their favor on the grounds of qualified immunity. The doctrine of qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The burden of proof is on the party seeking qualified immunity. *Wilson v. Prince George's Cty., Md.*, 893 F.3d 213, 219 (4th Cir. 2018).

In determining whether an official is entitled to summary judgment on the basis of qualified immunity, courts engage in a two-pronged inquiry. *Smith v. Ray*, 781 F.3d 95, 100 (4th Cir. 2015). The first prong asks whether the facts, taken in the light most favorable to the party asserting the injury, show the defendant's conduct violated a constitutional right. *Id.* (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The second prong asks whether the right was "clearly established" at the time of the defendant's conduct. *Id.* If the answer to either prong is "no," the official is entitled to qualified immunity.

As to all defendants except Dr. Ohai, the court has resolved their motion on the merits

28

Case 7:18-cv-00504-EKD-JCH   Document 148   Filed 03/15/21   Page 29 of 37   Pageid#: 2781

and need not reach the issue of qualified immunity.  As to Dr. Ohai, the court concludes that the same disputes of fact that preclude summary judgment on Jamison's Eighth Amendment deliberate indifference claim also preclude summary judgment in Dr. Ohai's favor on qualified immunity.  In particular, Dr. Ohai contends that he is entitled to summary judgment, but he relies on the version of facts favorable to him and ignores the facts that a reasonable jury might find in Jamison's favor.  For example, he argues that Jamison "never appeared in distress, refused to avoid foods containing gluten, appeared to fake blood in his vomit, maintained his weight, had generally normal lab results, [vital signs] within normal limits, only had one positive occult blood test, and never corroborated blood in his vomit or stool (beside that one test)."  (Mem. Supp. Mot. Summ. J. 12, Dkt. No. 121.)  Based on this, he argues that his actions were "at worst a bad guess in a [gray] area," making qualified immunity appropriate.

In addressing qualified immunity at the summary judgment stage, though, courts adopt the *plaintiff's* version of the facts.  *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008).  Adopting Jamison's version of the facts, Dr. Ohai knew of his gluten sensitivity, it had been confirmed by blood work, outside specialists recommended a gluten-free diet and GI consult, which Dr. Ohai did not order but instead revoked Jamison's medical diet.  Additionally, Jamison repeatedly complained about significant symptoms and avers that he would have gone hungry had eaten only non-gluten foods on the regular prison diet, and there is a dispute of fact as to whether Jamison could have received adequate nutrition in that manner.  Under plaintiff's version of the facts, a reasonable jury could find that Dr. Ohai was deliberately indifferent to Jamison's serious medical needs.  Moreover, the court concludes that the law on this point was clearly established: the denial of a medically necessary diet or medically necessary care to treat a serious medical need violated a prisoner's Eighth Amendment rights, and Dr. Ohai does not argue to the contrary.  Thus, there are disputed facts that preclude granting summary judgment in Dr. Ohai's

favor on qualified immunity grounds.  *See Culosi v. Bullock*, 596 F.3d 195, 202–03 (4th Cir. 2010) (explaining that a district court may conclude that factual disputes preclude entry of summary judgment on qualified immunity grounds).

### D.   Motion to Strike Gregg's Affidavit or for Sanctions (Dkt. No. 134)

Jamison also has filed a motion (Dkt. No. 134) in which he asks to strike Gregg's affidavit, which was submitted in opposition to Jamison's latest motion for preliminary injunction.  That affidavit (Dkt. No. 126-1) addresses Jamison's recent allegations that he still is not being provided a gluten-free diet at Deerfield and is suffering medical problems as a result. Jamison's motion will be denied for several reasons.

First of all, insofar as he requests that defendants be held in contempt, civil contempt is clearly inapplicable here because there is no specific "decree" that Gregg is alleged to have violated.[23]  To the extent that Jamison's motions can be interpreted as a request for sanctions, the court concludes that Jamison has not shown that Gregg's conduct is sanctionable.

In her most recent affidavit (Dkt. No. 126-1),[24] executed on May 28, 2020, Gregg acknowledges that Jamison has a current medical order for a gluten-free diet.  She states that she has provided guidance to the food service department at Deerfield concerning how to provide this diet.  *See also* Gregg Aff. ¶ 5, Dkt. No. 85-1 (describing what substitutions are made for

---

[23] In order to find a person in civil contempt, the person moving for a contempt finding must prove each of the following elements by clear and convincing evidence:

> (1) the existence of a valid decree of which the alleged contemnor had actual or constructive knowledge;
>
> (2) that the decree was in the movant's "favor";
>
> (3) that the alleged contemnor by its conduct violated the terms of the decree, and had knowledge (at least constructive knowledge) of such violations; and
>
> (4) that [the] movant suffered harm as a result.

*Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 301 (4th Cir. 2000) (citation omitted).

[24] There is another Gregg affidavit in the record, which was submitted both in opposition to Jamison's motion for preliminary injunctive relief (Dkt. No. 74-3) and in support of summary judgment (Dkt. No. 85-1).

gluten-containing items).  Gregg's affidavit states that she has "not taken any action to change

Jamison's diet order from gluten-free to wheat-free" and does "not have the authority to change

diet orders made by the physician."  (Gregg Aff. ¶ 5, Dkt. No. 126-1.)

Jamison says that Gregg's statement that she has not changed Jamison's diet order is

false.  Specifically, Jamison asserts that Gregg in fact did change Jamison's diet order to a

wheat-free diet order because she simply gives him the wheat-free diet (removing bread and

pasta and replacing with rice).  For support, he points to a September 25, 2019 memorandum

from D. Ingram-Harris, the assistant director of food services at Deerfield, who notes that

Jamison has a diet order for a gluten-free diet and includes the following statement:

> Per N. Gregg, VADOC State Dietician:  We will utilize the
> WHEAT-FREE DIET order in the Therapeutic Diet Handbook.
> Really all he can have is rice, oatmeal, grits, eggs, fruit, margarine,
> and vegetables.

(Dkt. No. 134-1 at 3.)

In terms of the merits of his argument, it is worth noting that Jamison relies on a

memorandum written by another individual as to what Gregg allegedly told her; this alone is not

incontrovertible proof (as Jamison seems to believe) that Gregg in fact substituted a wheat-free

diet for a gluten-free diet.  Notably, what Jamison is really complaining about is that there are

foods on his trays that he says are in violation of a gluten-free diet, but his complaints are not

supported by the exhibits he attaches to his motion.  In particular, he complains that he is

receiving grits repeatedly, and he claims that grits are not part of a gluten-free diet, pointing to

Exhibits 5 and 42 of his motion.[25]  But the exhibits actually ***confirm*** that the grits are an

---

[25]  In her first affidavit, Gregg explains, that on June 5, 2019, Jamison was on the common fare diet.  The common fare diet is an approved religious diet for offenders whose dietary needs cannot be met on the master menu. Jamison was approved for common fare on October 24, 2018, and was removed at his own request on June 11, 2019.  While on common fare, Jamison received common fare trays "with substitutions to meet his wheat-free diet order."  On June 5, 2019, Jamison complained that he was receiving grits, which are not kosher.  She instructed Townes that the oatmeal could be substituted for the grits and that "Jamison can eat oatmeal on the wheat-free diet" and it satisfied common fare.  (Gregg Aff. ¶ 5.)  She also avers that, by substituting rice and potatoes for gluten-

acceptable part of a gluten-free diet.  Exhibit 5 is informational medical literature from the Mayo

Clinic and says that "grits" can be eaten on a gluten-free diet.  Similarly, Exhibit 42 is a food

label for "White Corn Grits" and Exhibit 41 lists the *only* ingredient for that food as "White

Corn," which is not prohibited on a gluten-free diet, according to the documentation provided by

Jamison himself.   Likewise, he has submitted a wrapper from other foods, such as "unbreaded

fish portion" (which contains only "white fish fillet"), and sliced roast beef (which contains other

ingredients, but none that appear to contain gluten), and peanut butter.  He argues that the labels

show that these foods are "uncertified," but does not point to anything in them that violates a

gluten-free diet order.  (Dkt. No. 134-1 at 52–56.)

Again, his suggestion that these foods are not gluten-free is contradicted by the other

documents he submits, which list peanut butter, meats, and fish as foods that can be eaten on a

gluten-free diet.  (Dkt. No. 134-1 at 16, 23.)   Additionally, although Jamison seems to be

arguing that the food labels must state that they are "gluten-free," his belief is contradicted by the

medical literature he submits.  That literature states that if an item does not have ingredients

containing gluten, regardless of whether it is labeled gluten-free, it is, in fact, gluten-free and can

be eaten on a gluten-free diet.  (*Id.* at 6, 14–15.)

## E.   Motions for Preliminary Injunction (Dkt. No. 114)

Also pending before the court are Jamison's third and fourth motions for preliminary

injunction.  The party seeking such relief must show that the irreparable harm he faces in the

absence of relief is "neither remote nor speculative, but actual and imminent."  *Direx Israel, Ltd.*

*v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991).  Without a clear showing that

---

containing items such as bread and noodles, and substituting fruit for desserts such as cookies, cake, and bread
pudding, "the wheat-free diet meets Jamison's needs."  She thus instructed food service to continue following the
common fare menu with the wheat-free substitutions.  Once he was removed from the common fare diet at his
request, his food choices were broadened, particularly as to meat options, since common fare is more vegetable-
based.  (*Id.* ¶ 6.)

the plaintiff will suffer imminent, irreparable harm, the court cannot grant preliminary injunctive relief. *See DiBiase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (explaining that a "possibility" of irreparable harm is insufficient to satisfy the movant's burden).

In his third motion for preliminary injunction, Jamison asks to be placed on a gluten-free diet and claims that defendant Gregg improperly changed his diet from the gluten-free diet ordered by Amonette to a "wheat-free diet," that is making him sick. As already explained, Gregg has filed an affidavit denying that she changed his diet, explaining that she has no authority to alter a therapeutic diet, and noting that he is still under an order for a gluten-free diet. Upon consideration of the entire record, the court concludes that the Jamison is not entitled to a preliminary injunction. In short, Jamison is already receiving the only relief he seeks in his motion, and he presents no credible evidence (let alone any clear evidence) that his current diet is not gluten-free or that he faces likely and imminent harm without the injunction.

In his fourth motion, Jamison complains of various things that are occurring at Deerfield. He specifically asks the court to: (1) order defendants (some of them already dismissed) to stop further abuse and do their jobs; (2) require VDOC to have an independent dietician monitor his diet and ensure his meals are not withheld; (3) require VDOC to have an independent physician provide care for him and provide a treatment plan for him to follow; (4) require an investigation by the United States Attorney's Office; and (5) provide an independent mental health professional to help him overcome the abuse he has allegedly had to endure. (*See generally* Dkt. No. 137.)

The court has considered his motion, the affidavits submitted with defendants' response, and the entirety of the record. As an initial matter (and as already discussed), Jamison has not presented sufficient evidence that a gluten-free diet is being withheld so as to entitle him to a preliminary injunction. Moreover, the affidavits and other information before the court certainly

dispute his allegations of retaliation.  The court has found that there are disputes of fact as to his Eighth Amendment claim against Dr. Ohai based on his treatment at Dillwyn.  But the record as a whole reflects that Jamison is now receiving adequate care and a gluten-free diet.

Regardless, the alleged retaliation and additional acts that have occurred at Deerfield are not part of this case.  If Jamison wants to file a separate lawsuit alleging unlawful retaliation at Deerfield, where he is now housed, he must first exhaust administrative remedies and then may file a separate lawsuit regarding those events.  This case has been pending for years now and will soon be set for a trial.  The court will not allow him to add additional claims now that arose at a separate facility based on acts committed by non-defendants.  His complaints of retaliation are not properly part of this case.

Moreover, the facts supporting Jamison's request to prevent "retaliation" do not show a reasonable likelihood that, without the court's intervention, the same harm is likely to occur again, such that the harm is "neither remote nor speculative, but actual and imminent."  *Direx Israel, Ltd.*, 952 F.2d at 812; *see also Williams v. Maryland*, No. CIV.A. DKC 09-0879, 2011 WL 3422825, at *9 (D. Md. Aug. 3, 2011) (denying prisoner's motion for preliminary injunction where plaintiff had only speculative and "unsubstantiated fears" of retaliation from corrections officers).

Lastly, the court notes that much of the relief he seeks would require a significant intrusion into the administration of VDOC's operations of its facilities.  Nothing on the record before the court warrants such an intrusion for substantially the reasons set forth in the defendants' opposition.  (Dkt. No. 143 at 13–14.)  For these reasons, his fourth motion for preliminary injunction also will be denied.

**F.  Jamison's "Objections" to Prior Summary Judgment Ruling**

Jamison also filed what he calls "Objections" (Dkt. No. 142) to the court's prior ruling

granting summary judgment in the VDOC Defendants' favor.  The court has considered his

objections and, to the extent they can be considered a motion pursuant to Federal Rule of Civil

Procedure 54(b), his motion will be denied.  In pertinent part, Rule 54(b) provides that "any

order or other decision . . . that adjudicates fewer than all the claims or the rights and liabilities of

fewer than all the parties does not end the action as to any of the claims or parties and may be

revised at any time before the entry of a judgment adjudicating all the claims and all the parties'

rights and liabilities."  Fed. R. Civ. P. 54(b).  The Fourth Circuit has explained that "a court may

revise an interlocutory order under the same circumstances in which it may depart from the law

of the case: (1) 'a subsequent trial produc[ing] substantially different evidence'; (2) a change in

applicable law; or (3) clear error causing 'manifest injustice.'"  *Carlson v. Boston Scientific

Corp.*, 856 F.3d 320, 325 (4th Cir. 2017).  The grounds set forth in Jamison's motion presumably

are intended to fall within the third of these categories, but the court concludes that none of them

identify a clear error causing manifest injustice.

Addressing his objections briefly, Jamison first complains that this case has been treated

as "two cases" and he has had to respond to two motions for summary judgment.  There is

nothing improper about separate defendants (or groups of defendants) filing separate motions for

summary judgment.  Jamison elected to file a case naming many defendants and cannot now

complain that he must prosecute it.  He also makes vague references to discovery.  He does not

direct the court to any complaint prior to summary judgment in which he requested additional

discovery prior to responding, *see* Rule 56(d), nor does he now identify any specific discovery he

needed to respond.  Instead, he reiterates that the court noted defendants made inconsistent

statements about his diet orders and how this shows defendants are not credible.  As the court

noted in its order, however, it construed whatever facts were in the record in the light most

favorable to Jamison, so he was not harmed by the inconsistences, nor did they create a dispute

of material fact.  (*See* Mem. Op. 7, Dkt. No. 135.)

Jamison's second, fourth, and fifth objections complain about the court's legal rulings regarding his failure to exhaust certain claims, the liability of various defendant based on their participation in the exhaustion process, and the liability of non-medical personnel and their ability to rely on the judgment of medical personnel.  The court has considered his objections but finds neither clear error nor manifest injustice.

Jamison's third objection is that the court's statement that Jamison was observed in the medical unit with an opened bag of pretzels is a "flat out lie" because he did not have access to his personal property at that time.  (Dkt. No. 142 at 5.)  First, the court merely stated that "Dr. Ohai noted that . . . Jamison had been seen with an open bag of pretzels."  Indeed, that statement appears in his medical records, whether true or not.  In any event, the statement was offered as background, but it was not material to the court's decision as to any of the VDOC Defendants.

For the foregoing reasons, the court construes Jamison's "objections" as a motion pursuant to Federal Rule of Civil Procedure 54(b), and that motion will be denied.

### III.  CONCLUSION

For the foregoing reasons, the Medical Defendants' motion for summary judgment (Dkt. No. 120) will be granted as to all claims against all defendants except as to the Eighth Amendment deliberate indifference claim against Dr. Ohai based on his failure to treat Jamison's celiac disease beginning in July 2018, after the test results were given to Dr. Ohai and an outside physician recommended a strict gluten-free diet and a GI consult.  The official-capacity claims

against Amonette, solely for purposes of injunctive relief, also remain in the case.  An

appropriate order will be entered.

Entered: March 15, 2021.


/s/ Elizabeth K. Dillon
Elizabeth K. Dillon
United States District Judge